OPINION
This case is before us on the State's appeal of a decision granting Steven Asher's motion to suppress. In a single assignment of error, the State contends that the trial court erred in suppressing evidence seized during a pat down because the police officers had reasonable suspicion to believe that Asher was armed. The State also claims that Asher consented to the pat down.
Although the case is very close, we believe the trial court erred in suppressing the evidence. Accordingly, the trial court judgment will be reversed, and this case will be remanded for further proceedings.
At the suppression hearing, the State presented testimony from Dayton police officers, Nathan Via and Kevin Cooper. The defense then offered testimony from Steven Asher. According to the testimony, Via and Cooper were on patrol during the late evening hours in a residential area around the Children's Medical Center. The two men were partnered that evening due to a rash of auto break-ins and thefts in the area. Auto thieves apparently follow a typical procedure. First, the thief checks to see if a vehicle is unlocked. If the vehicle is not unlocked, the thief breaks smaller windows on the side (usually the rear passenger window) to gain entry. Often, the thief does not immediately engage in theft activity after gaining entry. Instead, he breaks a window, walks quickly away, and waits to see if anyone has noticed. If no one has noticed, the thief walks up to the vehicle as if it belonged to him, gains entry, and then steals items or takes the vehicle. Thieves often carry a knife or screwdriver for use in thefts.
At about 10:30 p.m. in the evening, Via and Cooper noticed a man (Asher) walking down the street. Via testified that Asher stopped next to a vehicle and appeared to be looking inside. As the officers drove toward Asher, they noticed that the vehicle directly in front of Asher had a broken opera window on the passenger side. Another vehicle parked directly behind the first had some punched locks. Punching, or prying locks open is another way of illegally gaining entry to vehicles.
As a result of their observations, the officers drove up and began field — interviewing Asher. At the time, the officers' cruiser was parked partially out in the roadway, about five feet from the curb. Both officers were seated in the cruiser, with the passenger side facing Asher. Via was in the passenger side. Via stated that he could be at a disadvantage safety-wise, due to his position.
When the officers asked Asher for identification, he did not have any. However, Asher did provide a social security number. In this regard, Officer Via's testimony was somewhat contradictory. On direct examination, Via indicated that he exited the cruiser right after noting that Asher did not have a picture identification. After exiting the cruiser, Via asked Asher if he had any weapons. When Asher said no, Via asked if Asher minded being patted down for weapons. At this time, Asher agreed to the pat down. Before or at the time Via did the pat down, he looked back at the computer screen and was able to see that Asher had a history of being found in areas of drug activity (Asher had been field-interviewed twice in a high drug area).
In contrast, during cross-examination, Via testified that he was still seated in the car when the computer search was made. He also said he did not exit the cruiser until after he saw the drug activity information on the screen.
Via testified that he wanted to do a pat down because Asher had on two bulky overcoats and could be carrying the type of weapon typically used in thefts. Via further said that he was concerned for his safety. Via saw no indication that Asher had a weapon, other than that it could be concealed inside a coat.
By the time the pat down started, Cooper was also out of the cruiser. Via patted down Asher's back side, while Cooper was in the front. Cooper felt something hard and round in Asher's inner sweatshirt pocket. The object was four to five inches long. Cooper thought it could possibly have been a weapon, such as a penknife or a screwdriver. After Cooper removed the object from the pocket, he discovered two hypodermic syringes, bundled together, with caps on the needles. The officers then placed Asher in handcuffs for possession of drug paraphernalia. They finished the search and found two capsules, one of which contained heroin. Subsequently, Asher was charged with possession of heroin.
In contrast to Via's testimony, Cooper did not say that Asher was looking into a car. Instead, Cooper indicated that he saw Asher walking down the street. He then noticed Asher hesitate briefly when he saw the cruiser, and continue walking. After the cruiser stopped, Via motioned Asher over to the cruiser. Asher walked over to the cruiser, bent down, and talked to Via. Via asked Asher if he had any identification. Cooper also asked Asher where he lived and where he was going. At that time, Asher said his bus had broken down and he was walking to work. The officers also asked Asher if he had seen anyone breaking into cars, and he said no. Asher explained that he was just going to work.
Shortly after receiving the computerized information about Asher, Cooper got out of the cruiser. Cooper was also aware of a known drug house about one half block away. According to Cooper, the officers wanted to do a pat down because of the prior field interviews on file as well as the damage to the cars. Cooper testified that they asked Asher if he minded if they did a pat down. However, Cooper also admitted that he wrote on the police report that the officers "informed" Asher that they were going to do a pat down.
As we mentioned, the defense called Asher to testify. Asher indicated that on the evening in question, he was taking a bus to work. The bus broke down, and the bus company sent a van out to take the passengers where they needed to go. Since the bus driver could not guarantee how long this would take, Asher decided to walk to work. As he walked down the street, he saw a police cruiser pass and then do a U-turn in the road. When the cruiser stopped, the officer waved Asher towards the cruiser. Consequently, Asher walked up to the cruiser and crouched down. The officers then asked Asher if he had seen any kids breaking into cars. In response, Asher said that he hadn't seen anything, that his bus had broken down, and that he was walking to work. Following this discussion, the officers asked for a picture identification, which Asher did not have. Asher then gave the officers his social security number and address.
After the officers pulled up the information on the social security number, one officer got out of the car pretty quick. This officer approached Asher rather quickly and said he was going to search for weapons. Asher did not respond because he was startled and did not know why they were searching him. After the police found the syringes, they handcuffed Asher and continued to search. When they found the capsules, they put Asher in the back of the cruiser and did a field test of the drugs. Eventually, the officers took Asher by his place of employment so he could tell his supervisor that he would not be at work that night.
After hearing the above evidence, the trial court granted the motion to suppress. The court found that the officers appropriately conducted an investigatory detention, based on the nature of the crimes in the area and the fact that Asher was walking in the area of two cars that may or may not have been the objects of unlawful entry. However, the court also concluded that the officers did not have a reasonable basis to frisk Asher. In this regard, the court first remarked that even though Asher was in an area of high drug activity, there was no articulable evidence that Asher was involved in any drug activity known to the officers when he was stopped.
Second, the court found the officers had no articulable basis for believing that Asher would desperately want to get away. In this vein, the court focused on the fact that Asher voluntarily walked over to the cruiser and cooperated with the officers completely before the search.
Finally, the court found no evidence, based on the officers' experience, that tools for breaking into cars had been used in a manner injurious to the officers' safety. The court further relied on Asher's lack of furtive gestures or indication that he was armed.
On appeal, the State contends that the trial court erred in suppressing evidence because the officers had reasonable, articulable suspicion for a pat down. The State's initial point in this regard is that the trial court held the officers to an incorrect standard, i.e., the court felt the officers must have actually been attacked with screwdrivers or knifes wielded by car thieves.
In reviewing suppression decisions, we accept the trial court's findings of fact if supported by competent, credible evidence. We then decide, de novo, if the court's conclusions of law, based on the findings of fact, are correct. State v. Mackey (2001), 141 Ohio App.3d 604, 609.
After reviewing the evidence and the law, we agree that the officers did not have to testify that they had personally been attacked by persons wielding screwdrivers. As the Ohio Supreme Court has said on many occasions:
 [t]he frisk, or protective search, approved in Terry is limited in scope to a pat-down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior he is investigating at close range may be armed and dangerous. * * * While probable cause is not required, the standard to perform a protective search, like the standard for an investigatory stop, is an objective one based on the totality of the circumstances. * * * The rationale behind the protective search is to allow the officer to take reasonable precautions for his own safety in order to pursue his investigation without fear of violence.
State v. Andrews (1991), 57 Ohio St.3d 86, 89, discussing Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Because the standard is objective, reasonableness is not based on the subjective experiences of a particular officer.
On the other hand, we do not think the trial court meant to imply that Officers Via and Cooper must have been personally attacked. If this were the standard, police officers would be very limited in their ability to reasonably suspect that an individual is armed and dangerous. Specifically, officers are probably not often attacked by car thieves brandishing screwdrivers. What we think the court wanted, instead, was objective evidence that such incidents can and do happen. This was appropriate, since a reasonable belief must be grounded in reality. However, the evidence does not have to be anecdotal. For example, case law in Ohio indicates that screwdrivers have been used as deadly weapons, and have been specifically used for the purpose of escaping from police officers. See State v. Lee (Mar. 26, 1991), Franklin App. No. 90AP-743, unreported, 1991 WL 42474, p. 1 (screwdriver used to try to escape officer); State v. Harris (Sept. 4, 1990), Franklin App. No. 89AP-1342, unreported, 1990 WL 129256, p. 4 (screwdriver is an instrument capable of inflicting death); and State v. Darrington (Sept. 21, 1995), Cuyahoga App. No. 65588, unreported, 1995 WL 558850, p. 3 (also holding that screwdriver is an instrument capable of inflicting death).
Accordingly, the officers in this case did not have to furnish anecdotal evidence that screwdrivers had been used as weapons, and the trial court's decision is incorrect, to the extent that it implies otherwise. We think the officers could have had a reasonable belief that Asher was armed and dangerous if he carried the type of object used for car thefts, i.e., a screwdriver or a knife. In this regard, we note that the officers were in the area to investigate car theft. Cars parked along the road were damaged in a way characteristic of such theft, and Asher was found in the vicinity of the damaged cars, late at night. The trial court also accepted Via's testimony that Asher appeared to be looking into a damaged car. Finally, Via testified that he patted Asher down because Asher could have been carrying a weapon used for car theft and because he was concerned for his safety. Under the circumstances, we think the officers had a reasonable suspicion that Asher was armed and dangerous.
Furthermore, the officers did not have to sit in the cruiser, in a position of relative danger, while they investigated. As we mentioned, Asher testified that he crouched beside the open passenger window while talking to Officer Via. Asher could easily have attacked Via from this position, and both officers would have been handicapped in responding. An officer does not have to stay in a vulnerable position while temporarily questioning a potential suspect.
As we said, a number of conflicts exist, even in the officers' testimony, and the issue is close. However, based on the factual findings of the trial court and the applicable law, we must conclude that the frisk was not unreasonable.
We do agree with the trial court that articulable suspicion was not reasonably based on the alleged drug activity. Moreover, Asher was cooperative with the officers and did not make furtive movements. Nonetheless, these are not the only pertinent factors. As the Ohio Supreme Court has said, the standard for a protective search is based on the totality of the circumstances. Andrews, 57 Ohio St.3d at 89. Therefore, even if some factors do not invoke alarm, others may cause an officer to reasonably suspect that an individual is armed and dangerous.
In light of the preceding discussion, the State's single assignment of error is sustained. Because the trial court erred in finding a lack of reasonable cause for the frisk, we do not need to decide the State's alternate argument that Asher, in fact, consented to the search. Since the officers had reasonable grounds for the search, Asher's consent was not required.
Having sustained the State's single assignment of error, we reverse the trial court judgment and remand this case for further hearing.
FAIN, J., and HILDEBRANDT, J., concur.
(Hon. Lee H. Hildebrandt, Jr. of the Court of Appeals, First Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).