[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 504.]

THE STATE EX REL. OHIO AFL-CIO ET AL. *v.* OHIO BUREAU OF WORKERS'
COMPENSATION ET AL.

[Cite as *State ex rel. Ohio AFL-CIO v. Ohio Bur. of Workers' Comp.*, 2002-
Ohio-6717.]

*Workers' compensation—Warrantless drug and alcohol testing of injured*
*workers—2000 Am.Sub.H.B. No. 122 violates the protections against*
*unreasonable searches contained in the Fourth Amendment to the United*
*States Constitution and Section 14, Article I of the Ohio Constitution.*

(No. 2001-0642—Submitted January 30, 2002—Decided December 18, 2002.)

IN MANDAMUS.

———————————

SYLLABUS OF THE COURT

2000 Am.Sub.H.B. No. 122, which permits the warrantless drug and alcohol testing
of injured workers without any individualized suspicion of drug or alcohol
use, violates the protections against unreasonable searches contained in the
Fourth Amendment to the United States Constitution and Section 14,
Article I of the Ohio Constitution.

———————————

PFEIFER, J.

{¶1} The issue in this case is whether 2000 Am.Sub.H.B. No. 122 ("H.B. 122"), which permits the warrantless drug and alcohol testing of injured workers, is constitutional. We find that H.B. 122 violates the protections against unreasonable searches contained in the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution.

Factual Background

{¶2} The relators in this matter are the Ohio AFL-CIO, its president, William A. Burga, and the United Auto Aerospace & Agricultural Implement Workers of America, Regions 2 and 2-B ("UAW"). The respondents are the Ohio Bureau of Workers' Compensation, James Conrad, Administrator ("BWC"), and the Industrial Commission of Ohio ("the commission").

{¶3} Relators filed an original action in mandamus in this court on April 3, 2001, seeking to prevent the BWC and the commission from enforcing amendments to R.C. 4123.54 that the General Assembly enacted in H.B. 122. Those provisions were to become effective on April 10, 2001.

{¶4} R.C. 4123.54(A)(2) excludes from workers' compensation benefits anyone whose injury was "[c]aused by the employee being intoxicated or under the influence of a controlled substance * * * where the intoxication or being under the influence of a controlled substance * * * was the proximate cause of the injury." H.B. 122 did not change this section. H.B. 122 did add Section (B), setting forth how an employer may prove that its employee was intoxicated or under the influence of a controlled substance.

{¶5} Through H.B. 122, R.C. 4123.54(B) now provides that where chemical testing reveals certain prohibited levels of alcohol or controlled substances in the body of an injured employee, a rebuttable presumption arises that the employee's injury was proximately caused by the influence of alcohol or a controlled substance. By incorporating R.C. 4511.19(A)(2) to (7), R.C. 4123.54(B) allows for blood, breath, or urine testing of employees.

{¶6} Moreover, and most significant for relators, under H.B. 122, when an injured employee refuses to submit to an employer-requested chemical test, that employee is rebuttably presumed to have been intoxicated or under the influence of a controlled substance at the time of the workplace injury, and that condition is rebuttably presumed to have been the injury's proximate cause. R.C.

4123.54(B)(5). The statute states that "the employee's refusal to submit" to any chemical test "may affect the employee's eligibility for compensation and benefits."

{¶7} Thus, under H.B. 122, every Ohio worker injured on the job must submit to an employer-requested chemical test, regardless of whether the employer has any reason to believe that the injury was caused by the employee's intoxication or use of controlled substances. Failure to submit to a breath, blood, or urine test creates a rebuttable presumption against the employee that use of drugs or alcohol caused the injury.

{¶8} Relators allege that the combined 950,000 members of the AFL-CIO and UAW are potential subjects of the testing requirements contained in H.B. 122, requirements that relators allege are unconstitutional. Their complaint does not allege any specific instance of a constitutional violation that has actually occurred.

{¶9} Respondents moved to dismiss the mandamus action, and this court denied that motion on July 25, 2001. 92 Ohio St.3d 1447, 751 N.E.2d 484. This court, sua sponte, granted an alternative writ, setting a schedule for briefing and the presentation of evidence. 92 Ohio St.3d 1455, 752 N.E.2d 287.

Law and Analysis

{¶10} The first issue before us is whether the relators have standing to bring this mandamus action. Respondents argue that relators merely assert a potential harm to some of their members, which is insufficient to confer standing. But conferring standing in this case would set no precedent in that regard—this court has previously ruled upon the constitutionality of the workers' compensation system in *State ex rel. Ohio AFL-CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 631 N.E.2d 582, upon actions in mandamus, prohibition, and quo warranto brought by, among other parties, relators AFL-CIO and UAW.

{¶11} Moreover, "[t]his court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they

may be resolved in a form of action that involves no rights or obligations peculiar to named parties." *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 471, 715 N.E.2d 1062. In *Sheward*, this court held that "[w]here the object of an action in mandamus and/or prohibition is to procure the enforcement or protection of a public right, the relator need not show any legal or special individual interest in the result, it being sufficient that the relator is an Ohio citizen and, as such, interested in the execution of the laws of this state." Id. at paragraph one of the syllabus.

{¶12} The granting of writs of mandamus and prohibition to determine the constitutionality of statutes will "remain extraordinary" and "limited to exceptional circumstances that demand early resolution." Id., 86 Ohio St.3d at 515, 715 N.E.2d 1062 (Pfeifer, J., concurring). We find this case to be one of those rare cases. As the statutory scheme at issue in *Sheward* affected every tort claim filed in Ohio, H.B. 122 affects every injured worker who seeks to participate in the workers' compensation system. It affects virtually everyone who works in Ohio. The right at stake, to be free from unreasonable searches, is so fundamental as to be contained in our Bill of Rights. H.B. 122 has sweeping applicability and affects a core right. Since H.B. 122 therefore implicates a public right, we find that relators meet the standing requirements of *Sheward*.

{¶13} The threshold constitutional question is whether the searches allowed by H.B. 122 involve state action. "Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." *Skinner v. Ry. Labor Executives' Assn.* (1989), 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639. While H.B. 122 applies to the state of Ohio itself as an employer, it also affects employees working for private employers. Does the testing conducted by private employers pursuant to H.B. 122 constitute state action? We hold that it does.

4

{¶14} The United States Supreme Court has held that attributing actions by private entities to the state "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001), 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807. However, the court has identified several relevant factors. Id. at 296, 121 S.Ct. 924, 148 L.Ed.2d 807. The situations where the court has found that a challenged activity may be "state action" include those in which the private activity results from the state's exercise of coercive power, when the state provides significant encouragement for the activity, either overt or covert, or when a private actor operates as a willful participant in joint activity with the state or its agents. Id.

{¶15} In short, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may fairly be treated as that of the State itself.' " Id. at 295, 121 S.Ct. 924, 148 L.Ed.2d 807, quoting *Jackson v. Metro. Edison Co.* (1974), 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477.

{¶16} The entanglement of private employers and the state in the administration of Ohio's workers' compensation system dates back to the system's creation and is rooted in the Ohio Constitution and statutory law. Section 35, Article II of the Ohio Constitution allows for the establishment of a workers' compensation system to be "administered by the state." Section 35, Article II states that the compensation awarded thereunder "shall be in lieu of all other rights to compensation, or damages, for * * * death, injuries, or occupational disease, and any employer who pays the premium or compensation provided by law * * * shall not be liable to respond in damages at common law or by statute for such death, injuries or occupational disease."

{¶17} By statute, the state has made employer participation in the workers' compensation system mandatory, with limited exceptions. R.C. 4123.01(B)(2); R.C. 4123.35. Noncomplying employers are subject to suit brought by the state.

R.C. 4123.75. The administrative process for the adjudication of employees' claims is state-created. Section 35, Article II, Ohio Constitution; R.C. 4121.02 (creating the Industrial Commission); R.C. 4121.121 (creating the Bureau of Workers' Compensation).

{¶18} Before this backdrop of state control comes H.B 122. While employers can set forth their own drug testing procedure for purposes of exposing employee misconduct, they cannot themselves use test results to affect an employee's entitlement to workers' compensation. The final word on eligibility for workers' compensation belongs to the state. It is R.C. 4123.54 that denies compensation for injuries "[c]aused by the employee being intoxicated or under the influence of a controlled substance." Only that legislative action makes intoxication or drug use relevant in determining workers' compensation eligibility. H.B. 122 modified R.C. 4123.54 to create a procedure to prove intoxication or drug use as a proximate cause of an injury. In H.B. 122, the General Assembly dictated when the test is to be performed, the substances to be tested for, the prohibited levels of those substances, and the consequences if the employee tests positive. Most important for this case, the statute sets forth the consequences for the employees' refusal to take an employer-requested test. Without this legislation, an employer could not withhold an employee's workers' compensation for failure to take a drug test. The rebuttable presumption created by the state is the hammer that forces an employee to take an employer-directed drug test. It is a complete entanglement of private and state action.

{¶19} We therefore find that the state of Ohio's significant promotion of drug testing through its exercise of coercive power creates the close nexus between the state and the challenged action required to constitute state action.

{¶20} Thus, we face the issue of whether H.B. 122 is constitutional. The Fourth Amendment to the Constitution of the United States reads:

**{¶21}** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

**{¶22}** Section 14, Article I of the Ohio Constitution is virtually identical to the Fourth Amendment. Therefore, we look to United States Supreme Court precedent to determine the constitutionality of H.B. 122 under the federal Constitution and the Ohio Constitution.

**{¶23}** The United States Supreme Court, in a line of cases beginning with *Skinner*, has addressed the issue of suspicionless drug testing in the workplace and at schools. In each case, the court has held that the collection and subsequent analysis of biological samples obtained through blood, breath, or urine testing "must be deemed Fourth Amendment searches." *Skinner*, 489 U.S. at 618, 109 S.Ct. 1402, 103 L.Ed.2d 639. See discussion of *Skinner* cases, infra. Thus, the testing allowed by H.B. 122 does constitute a search for Fourth Amendment analysis purposes.

**{¶24}** The next step is to determine whether a given search is reasonable. In general, the reasonableness of a particular search or practice " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402, 103 L.Ed.2d 639, quoting *Delaware v. Prouse* (1979), 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660. What we commonly think of as a necessary element of a reasonable search, a warrant based upon probable cause, is not a prerequisite to every search. The Supreme Court has held that "[a] search unsupported by probable cause can be constitutional * * * 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " *Vernonia School Dist. 47J v. Acton* (1995), 515 U.S.

646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564, quoting *Griffin v. Wisconsin* (1987), 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709.

{¶25} Thus, as long as  the government interest behind the drug testing is not merely to fight crime, i.e., when the results of testing are not used to procure criminal convictions, governmental special needs can be enough to obviate the general requirement of probable cause or individualized suspicion of wrongdoing:

{¶26} "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner*, 489 U.S. at 624, 109 S.Ct. 1402, 103 L.Ed.2d 639.

{¶27} The "special needs" analysis includes a consideration of the practicalities of achieving the government's objectives through the ordinary means of securing a warrant based on probable cause.  If securing a warrant is impracticable, then the government's special needs are weighed against the individual's privacy interest:

{¶28} "Our precedents establish that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler v. Miller* (1997), 520 U.S. 305, 318, 117 S.Ct. 1295, 137 L.Ed.2d 513.

{¶29} The balance between governmental special needs and individuals' expectation of privacy has been the focus in a line of Supreme Court cases addressing suspicionless searches. *Skinner* was the first of these cases to set forth the "special needs" analysis. In *Skinner*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, the Federal Railroad Administration promulgated safety regulations that required railroads to perform blood and urine tests of employees who are involved in certain train accidents, and authorized railroads to administer breath and urine

tests to employees who violate certain safety rules. The court found that the procedures were constitutional due, in part, to "[t]he Government's interest in regulating the conduct of railroad employees to ensure safety." Id., 489 U.S. at 620, 109 S.Ct. 1402, 103 L.Ed.2d 639. Accidents involving railroads are potentially catastrophic, and the goal of preventing such accidents "may justify departures from the usual warrant and probable-cause requirements." Id. Evidence also suggested that substance abuse had contributed to railroad accidents in the past. Id. at 607-608, 109 S.Ct. 1402, 103 L.Ed.2d 639. Suspicionless searches were held to be appropriate because railroad supervisors were not trained in enforcing the law and the intricacies of Fourth Amendment jurisprudence. Id. at 623-624, 109 S.Ct. 1402, 103 L.Ed.2d 639. Automatic testing would be the only practicable way to achieve the ends of the state.

{¶30} The court weighed these special needs of the government against the expectation of privacy of railroad workers. The court noted that the industry was already pervasively regulated for safety reasons. The industry already had a long history of periodic physical examination of workers. Id., 489 U.S. at 627-628, 109 S.Ct. 1402, 103 L.Ed.2d 639. Thus, the court found that in that particular industry, where the safety of employees and the public was paramount, and where the industry involved was already highly regulated as to safety, the testing procedures promulgated were constitutional.

{¶31} In *Natl. Treasury Emp. Union v. Von Raab* (1989), 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685, the court found constitutional the employee drug-testing program implemented by the United States Customs Service. The Customs Service required urinalysis tests for employees who sought transfer or promotion to three categories of positions: (1) those with direct involvement in drug interdiction, (2) those that required carrying of a firearm, and (3) those requiring the handling of classified materials. The testing was deemed necessary for the first two categories of positions for the safety of the customs agents. As for the third

category of positions, the Commissioner of Customs determined that persons who held classified information might be susceptible to bribery or blackmail by reason of their own illegal drug use.

{¶32} Again, the court found that, with regard to the first two categories, the warrant requirement would be impractical even given the expertise of the Customs Service, because imposing a warrant requirement "would serve only to divert valuable agency resources from the Service's primary mission." Id. at 666, 109 S.Ct. 1384, 103 L.Ed.2d 685. Again, the court weighed the valid public interests advanced by the policy against its interference with individual liberty.

{¶33} The court found that "operational realities" necessarily would affect a Customs Service employee's individual expectation of privacy:

{¶34} "While these operational realities will rarely affect an employee's expectations of privacy with respect to searches of his person, or of personal effects that the employee may bring to the workplace, it is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches." (Citation omitted.) *Von Raab*, 489 U.S. at 671, 109 S.Ct. 1384, 103 L.Ed.2d 685.

{¶35} For instance, the court pointed out, employees of the United States Mint should expect to be subject to routine personal searches. The court found that those holding Customs Service jobs that involve interdiction and the use of firearms would naturally have a diminished expectation of privacy with respect to the intrusions caused by a urine test, "[u]nlike most private citizens or government employees in general." Id. at 672, 109 S.Ct. 1384, 103 L.Ed.2d 685.

{¶36} However, as to the persons who had contact with classified material, the court was unwilling to uphold the Customs Service policy due to the lack of a sufficient record. Since the range of people tested under this category seemed to include such positions as accountant, animal caretaker, and messenger, the court remanded that portion of the case for a determination of whether category three was

overly broad. The lower court eventually found that the persons mentioned by the Supreme Court were not in fact included in category three and that those who were so categorized did encounter classified material, and thus should be subject to testing. *Natl. Treasury Emp. Union v. Hallett* (E.D.La. 1991), 756 F.Supp. 947.

{¶37} Again in *Von Raab*, the court was careful to take note of the specific job or position involved to determine whether there truly were legitimate "special needs" of the government. Also, the nature of the employment of Treasury employees meant that their expectations of privacy were markedly different from those of private citizens.

{¶38} In *Vernonia School Dist. v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564, the court found that the school district's policy requiring urinalysis drug testing of all students who participate in the district's athletics programs did not violate the Fourth Amendment. In *Vernonia*, the school district required students to consent to urinalysis in order to participate in sports. The court found that the school district's interest in discouraging drug use, protecting student health, and maintaining discipline was compelling. The district convinced the court that a drug culture, led by athletes, had led to a general state of rebellion in the local schools, with disciplinary actions reaching "epidemic proportions." Id. at 663, 115 S.Ct. 2386, 132 L.Ed.2d 564. While the court admitted that testing based upon particularized suspicion might be less intrusive, it stated in *Vernonia* that reasonableness is not limited to the least intrusive search practicable. Id. at 663, 115 S.Ct. 2386, 132 L.Ed.2d 564. In fact, the court found that testing based upon suspicion would be worse than blanket, suspicionless testing. The court pointed out that teachers, untrained for the task, would be called upon to make decisions on whom to test, and that this would force teachers into an adversarial role that might cause difficulties in student-teacher relationships. Id. at 664, 115 S.Ct. 2386, 132 L.Ed.2d 564. All of those factors led to the special-needs finding.

**{¶39}** The court then weighed the district's compelling need against the privacy interests of the students. The court found that students, especially student athletes, have a lower expectation of privacy than members of the general population, because school sports involve public locker rooms, group showers, and changing clothes in the presence of others. Therefore, the court found the district's policy to be constitutional.

**{¶40}** In *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513, the court found that the government's special needs were not sufficient to allow for the mandatory drug testing for candidates for certain state offices in Georgia. Georgia had enacted a statute in 1990 that required candidates for nomination or election to certain state offices to provide proof that they had taken a drug test in the prior 30 days and that the results were negative in order to qualify for a place on the ballot. See former Ga.Stat. 21-2-140. The court found that this requirement "[did] not fit within the *closely guarded* category of constitutionally permissible suspicionless searches." (Emphasis added.) *Chandler*, 520 U.S. at 309, 117 S.Ct. 1295, 137 L.Ed.2d 513.

**{¶41}** Georgia argued that holding high state office is incompatible with unlawful drug use. Id. at 318, 117 S.Ct. 1295, 137 L.Ed.2d 513. The court found that the hazards cited by the state were merely hypothetical, without any indication of a concrete danger justifying departure from the Fourth Amendment. Id. The court found that "the candidate drug test Georgia has devised diminishes personal privacy for a symbol's sake." Id., 520 U.S. at 322, 117 S.Ct. 1295, 137 L.Ed.2d 513.

**{¶42}** In the cases where the court has allowed the suspicionless drug testing, the targeted individuals either have a demonstrated history of abuse, e.g., *Skinner* and *Vernonia*, hold a unique position, e.g., *Von Raab*, or have the potential for creating risks of catastrophe if under the influence of a mind-altering substance, e.g., *Von Raab* and *Skinner*. The overriding idea is that the situations and targeted groups are unique and discrete.

**{¶43}** H.B. 122 does not fit within the parameters of what the court has found to be the "closely guarded" category of constitutionally permissible suspicionless searches. H.B. 122 does not target a group of people with a documented drug and alcohol problem. It is not directed at a segment of the population with drug use known to be greater than that of the general population— its target group *is* the general population. It does not target a segment of industry where safety issues are more profound than in other industries. It does not target certain job categories where drug or alcohol use would cause a substantial danger to workers, co-workers, or the general public.

**{¶44}** In the cases where suspicionless testing of employees was allowed, *Skinner* and *Von Raab*, it was the exceptional nature of the employment situations that created the requisite special governmental needs to override the warrant requirement. The searches allowed by H.B. 122 involve everyone who works in Ohio. While *Von Raab* spoke of Treasury employees being "[u]nlike most private citizens or government employees in general," id., 489 U.S. at 672, 109 S.Ct. 1384, 103 L.Ed.2d 685, H.B. 122 addresses those same private citizens and government employees and treats them as though they hold extraordinary positions.

**{¶45}** The BWC points to certain statistics from its own Drug-Free Workplace Program to demonstrate Ohio's special needs. The BWC claims that "[s]tudies have shown that between 38 and 50% of all workers' compensation claims are related to the use of alcohol and drugs in the workplace." First, there is a significant difference between claims being "related to" alcohol and drugs and being proximately caused by them. Second, that citation does not come from the BWC's own analysis of claims brought in Ohio but upon a study by the National Council on Compensation Insurance. There are no statistics relied upon by the BWC or its amici that result from studies done by the BWC or other state agencies regarding workplace injuries in Ohio that are proximately caused by substance abuse in the workplace.

{¶46} We do not mean to state that drug and alcohol use in the workplace is not a problem, just as we do realize that it is also a problem outside the workplace. The problem by its nature is a general one, spread out across all socioeconomic levels, throughout all levels of the workforce. Substance abuse can be a problem for anyone. But suspicionless testing, the court instructs, is not a solution for just anyone. Suspicionless testing can be applicable to certain carved-out categories of workers, but not to all workers.

{¶47} Even if there were special needs successfully asserted by the state, the expectation of privacy of Ohio's workers would outweigh them. The vast majority of Ohio workers are not subject to the "operational realities" cited by the court in *Von Raab*. Id., 489 U.S. at 671, 109 S.Ct. 1384, 103 L.Ed.2d 685. Most employees do not work in industries as highly regulated as that in *Skinner*. Most do not operate inherently dangerous machinery that can cause catastrophic damage to the public. In fact, amicus curiae Greater Cleveland Growth Association, Counsel of Smaller Enterprises points out in its brief that according to a 1999 federal study, the highest rate of heavy drinking and illicit drug use occurs among restaurant workers and bartenders.

{¶48} Under H.B. 122, all kinds of workers who suffer their injuries in a myriad of ways must face the prospect of undergoing drug and alcohol tests. A secretary suffering from carpal tunnel syndrome, a passenger in a company-owned vehicle who is blindsided by a drunk driver, a painter who happens to be near a boiler in a manufacturing plant when it explodes, a chemistry teacher burned while putting out a fire started by a student—all would be subject to an employer-requested drug test upon their injury. Their failure to agree would result in a rebuttable presumption that drug or alcohol use proximately caused their injury. While that presumption may be overcome in a hearing, the presumption changes the way an employee presents his or her case. Whether or not the presumption in the end affects their claim, the fact remains that they are subject to a government-

imposed sanction for failure to submit to the chemical testing. Ordinary people working ordinary jobs do not have the expectation that they are subject to searches without reason.

{¶49} Moreover, in Ohio, workers have an additional expectation of privacy when it comes to workers' compensation. The workers' compensation system is designed to avoid the adversarial character of the civil justice system, allowing workers to recover for injuries they suffer on the job without having to undertake the risk and expense of a civil trial. In return, employers are protected from large civil damage awards. In *Blankenship v. Cincinnati Milacron Chem., Inc.* (1982), 69 Ohio St.2d 608, 614, 23 O.O.3d 504, 433 N.E.2d 572, this court explained the philosophy behind the system:

{¶50} "The workers' compensation system is based on the premise that an employer is protected from a suit for negligence in exchange for compliance with the Workers' Compensation Act. The Act operates as a balance of mutual compromise between the interests of the employer and the employee whereby employees relinquish their common law remedy and accept lower benefit levels coupled with the greater assurance of recovery and employers give up their common law defenses and are protected from unlimited liability."

{¶51} Under such a system of compromise for mutual benefit, a worker would not expect to face the indignity of drug and alcohol testing without any suspicion of wrongdoing. Workers would not anticipate that their sobriety would be called into question merely for suffering an industrial accident. They would expect that since Ohio's workers' compensation system is a creature of the Ohio Constitution, they would not have to jump through an embarrassing hoop to gain the protection of the system. They would have the expectation that Section 34, Article II of the Ohio Constitution would also protect them from baseless searches: "Laws may be passed fixing and regulating the hours of labor, establishing a

minimum wage, and *providing for the comfort, health, safety and general welfare of all employees.*" (Emphasis added.)

{¶52} We therefore find that the individual expectation of privacy of Ohio's workers outweighs any special needs asserted by the state and that H.B. 122 therefore violates the Fourth Amendment.

{¶53} Further, we find that H.B. 122 also violates the Ohio Constitution. "The Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall." *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, syllabus. We find that the Ohio Constitution, which prohibits unreasonable searches and also contains special considerations for Ohio's workers, provides additional and independent protection against the searches allowed by H.B. 122.

{¶54} Accordingly, 2000 Am.Sub. H.B. No. 122, which permits the warrantless drug and alcohol testing of injured workers without any individualized suspicion of drug or alcohol use, violates the protections against unreasonable searches contained in the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution.

{¶55} We therefore grant relators' writ of mandamus.

Writ granted.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., dissent.

COOK, J., dissents.

————————————

**MOYER, C. J., dissenting.**

{¶56} The majority errs in reaching the merits of the issue of the constitutionality of R.C. 4123.54, as amended by 2000 Am.Sub.H.B. No. 122. Two

16

reasons support this conclusion: (1) the relators lack standing, and (2) the case before us does not present facts justifying the exercise of the original jurisdiction vested in this court by Section 2(B)(1), Article IV of the Ohio Constitution. Moreover, upon resolving to reach the merits in this case, the majority errs in finding the current statute unconstitutional. I therefore respectfully dissent.

I

Standing

{¶57} In Ohio, it is well established that standing exists only where a litigant "has suffered or is threatened with *direct* and *concrete* injury in a manner or degree different from that suffered by the public in general, that the law in question has caused the injury, and that the relief requested will redress the injury." (Emphasis added.) *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 469-470, 715 N.E.2d 1062. Similarly, an organization or association attempting to litigate on behalf of its members must establish that its members have suffered *actual* or *concrete* injury, rather than an abstract or suspected injury, in order to justify a finding of standing. *Ohio Contrs. Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 320, 643 N.E.2d 1088.

{¶58} The relators herein cannot meet these burdens. They do not allege that any workers' compensation claims have been filed in which a party has urged the application of any of the presumptions created by R.C. 4123.54(B). It follows that the relators do not allege facts showing that any of their members have been injured or are under an imminent threat of suffering a concrete injury.

{¶59} Rather the relators speculate that, sometime in the future, H.B. 122 "will be applied" to deny future workers' compensation claims, and "will be used by Employers" to compel workers to undergo drug testing. They claim that the provisions of H.B. 122 "potentially" apply to every injured worker. Perhaps most illustrative of the speculative nature of the relators' claim of injury is their assertion that the respondents, the Ohio Bureau of Workers' Compensation, its administrator,

and the Industrial Commission, "will apply the presumptions of R.C. 4123.54, as amended, to deny injured workers who have otherwise valid claims the right to receive workers' compensation." Because these assertions fall far short of the actual or imminent concrete injury required by long-standing Ohio law to justify recognition of standing, the court should dismiss this case.

{¶60} In *Sheward*, however, the court also recognized and applied a "public action" exception to the traditional standing rule, and allowed several Ohio organizations and a private individual to present a constitutional challenge to comprehensive tort reform legislation enacted as 1996 Am.Sub.H.B. No. 350 as an action in mandamus in this court. The relators in the case at bar argue that *Sheward* justifies a finding of standing in their challenge to H.B. 122.

{¶61} My vehement opposition to *Sheward* is well documented, not only in my written dissent to the decision itself, id. at 516-531, 715 N.E.2d 1062, but in separate opinions written thereafter. See *Burger v. Cleveland Hts.* (1999), 87 Ohio St.3d 188, 198, 718 N.E.2d 912 (Moyer, C.J., dissenting); *State ex rel. United Auto Aerospace & Agricultural Implement Workers of Am. v. Ohio Bur. of Workers' Comp.*, 95 Ohio St.3d 408, 2002-Ohio-2491, 768 N.E.2d 1129, ¶17-28 (Moyer, C.J., dissenting).

{¶62} With the passage of time, other observers have joined me in vociferously criticizing *Sheward*. The decision has been characterized as "an example of blatant judicial violation of jurisdictional doctrine." Loeb, Abuse of Power: Certain State Courts are Disregarding Standing and Original Jurisdiction Principles So They Can Declare Tort Reform Unconstitutional (2000), 84 Marq.L.Rev. 491, 492. It has been deemed "a manifestly gross example of political opportunism, allowing the majority to invalidate a disfavored law using a questionable approach." Tracy, Ohio Ex Rel. Ohio Academy of Trial Lawyers v. Sheward: The End Must Justify the Means (2000), 27 N.Ky.L.Rev. 883, 885. A writer in the Harvard Law Review characterized the reasoning of *Sheward* as

"awkward[]" and "overreaching" and as having "misappropriated" constitutional principles. Note, State Tort Reform—Ohio Supreme Court Strikes Down State General Assembly's Tort Reform Initiative (2000), 113 Harv.L.Rev. 804, at 804, 807. See, also, Black, State ex rel. Ohio Academy of Trial Lawyers v. Sheward: The Extraordinary Application of Extraordinary Writs and Other Issues; The Case That Never Should Have Been (2001), 29 Cap.U.L.Rev. 433; Werber, Ohio Tort Reform in 1998: The War Continues (1997), 45 Cleve.St.L.Rev. 539. Nevertheless, until overruled, *Sheward* must be acknowledged as precedent.

**{¶63}** In summarizing its holding, the court wrote in its syllabus in *Sheward* that "[w]here the object of an action in mandamus and/or prohibition is *to procure the enforcement or protection of a public right*, the relator need not show any legal or special individual interest in the result, it being sufficient that the relator is an Ohio citizen and, as such, interested in the execution of the laws of this state." (Emphasis added.) *Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062, paragraph one of the syllabus. However, contrary to this broad language, it is clear from the express representations made in the *Sheward* opinion, as well as its context, that the term "public right" as used in the syllabus requires more than a showing that a statute of questioned constitutionality is of widespread public interest, or even that it potentially may affect a large number of Ohio citizens.

**{¶64}** In *Sheward* the relators alleged that Am.Sub.H.B. No. 350 represented a legislative assault on the doctrine of separation of powers, a fundamental principle of our democracy. The court characterized the General Assembly as having "reenacted legislation which this court has already determined to be unconstitutional and/or in conflict with the rules we have prescribed pursuant to Section 5(B), Article IV of the Ohio Constitution governing practice and procedure for Ohio courts." Id. at 474, 715 N.E.2d 1062. The court determined that the relators' challenge to the comprehensive legislation contained in Am.Sub.H.B. No. 350 raised issues "of such a high order of public concern as to

justify allowing this action as a public action." Id. It noted that "[t]he people of this state have delegated their judicial power to the courts, and have expressly prohibited the General Assembly from exercising it," and observed that "it is difficult to imagine a right more public in nature than one whose usurpation has been described as the very definition of tyranny." Id.

{¶65} In short, the majority in *Sheward* believed that the legislative branch of government, in enacting Am.Sub.H.B. No. 350, had engaged in misconduct of such magnitude that the general rules of standing should be disregarded in order to protect the very fabric of our democracy. Inappropriately in my view, it deemed this "reenactment" to be an encroachment by the General Assembly into the judicial sphere, violating the principle of separation of powers.

{¶66} However, the majority expressly assured the bench and bar that it would "entertain a public action only *'in the rare and extraordinary case'* where the challenged statute operates, '*directly and broadly, to divest the courts of judicial power.*' " (Emphasis sic.) Id. at 504, 715 N.E.2d 1062. It specifically represented that it would "not entertain a public action to review the constitutionality of a legislative enactment unless it is of a magnitude and scope comparable to that of Am.Sub.H.B. No. 350." Id. We now know that this express promise of future judicial restraint made by the majority in *Sheward* was a hollow one.

{¶67} Nothing even approaching the circumstances described in *Sheward* exists in the case before us. It is true that the workers' compensation system in Ohio is of great importance to thousands of Ohio workers and employers. This does not mean that every time the General Assembly revises some aspect of workers' compensation law, an action challenging its constitutionality is a "public action" involving a "public right." If so, then virtually any legislative enactment affecting the public can be short-circuited to this court for immediate constitutional review.

{¶68} In my dissent in *Sheward*, I expressed my concern that thereafter "those dissatisfied with enactments of the General Assembly * * * will no longer consider a writ of mandamus or prohibition to be an extraordinary remedy: instead they will consider them the remedy of choice." Id. at 517, 715 N.E.2d 1062. Unfortunately, today my prognostication has been realized.

{¶69} I continue to believe that *Sheward* was wrongly decided. However, even assuming the validity of *Sheward*, no fundamental "public right" analogous to that found to exist in *Sheward* exists in the case at bar. Or, perhaps more accurately, the majority's extension of the public-right exception of *Sheward* to the case at bar allows that exception to engulf traditional standing rules.

{¶70} The relators do not allege facts justifying a finding that they have standing to bring this action. The case should therefore be dismissed.

II

Wrongful Exercise of Original Jurisdiction

{¶71} In order to be entitled to a writ of mandamus, the relator must establish (1) that the relator has a clear legal right to the relief prayed for, (2) that the respondent has a clear legal duty to perform the requested act, and (3) that the relator has no plain and adequate remedy at law. *State ex rel. Seikbert v. Wilkinson* (1994), 69 Ohio St.3d 489, 490, 633 N.E.2d 1128, 1129; R.C. Chapter 2731.

{¶72} As I noted in my dissent in *Sheward*, "[t]he Ohio Constitution does not vest this court with original jurisdiction to issue either a declaratory judgment or injunctive relief." Id., 86 Ohio St.3d at 516, 715 N.E.2d 1062 (Moyer, C.J., dissenting), citing Section 2, Article IV, Ohio Constitution; *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631. As in *Sheward,* the action before us is in effect an action seeking declaratory judgment and injunctive relief and does not fall within the parameters of our original jurisdiction in mandamus.

**{¶73}** Moreover, as in *Sheward*, the relators before us have an adequate remedy at law in the form of resort to the trial courts of the state, followed by appellate review. If R.C. 4123.54, as amended by H.B. 122, is indeed unconstitutional, that conclusion would be reached through the ordinary course of law where issues of fact and law are determined in the first instance by a trial court in a particular case, followed by appellate review. The original jurisdiction of this court to issue the extraordinary writ of mandamus established in the Ohio Constitution does not exist as a mechanism to bypass regular procedure to allow claims of unconstitutionality to be heard initially in this court. As I stated in *Sheward*, the trial courts of this state are the appropriate forum for initial determination of the validity of the relators' arguments, and even then only if they are presented as part of an actual justiciable controversy.

**{¶74}** In addition, the relators have neither alleged nor established that the respondents have failed to perform a duty required of them by law, that being a fundamental requisite for the proper exercise of original jurisdiction in mandamus by this court. The relators allege that "[b]ecause R.C. 4123.54, as amended, is unconstitutional, Respondents have a clear legal duty to refuse to apply it and to instead apply the previous version of R.C. 4123.54." The simple response to this contention is that there is nothing in the record to demonstrate that the respondents have yet been asked either to apply or to disregard the presumptions established in R.C. 4123.54. Because the respondents have not yet been presented with a case in which the presumptions of R.C. 4123.54, as amended by H.B. 122, have been in issue, it is eminently clear that the respondents have not yet failed to perform a duty required of them under the amended statute. Thus, they are under no clear legal duty to apply the statute at all. The conclusion is unavoidable that the purpose of this action is to obtain an advisory declaration of unconstitutionality before amended R.C. 4123.54 is implemented. Such an action seeks declaratory and injunctive relief, which this court has no original jurisdiction to grant.

**{¶75}** Moreover, as noted, relators argue that the respondents will have a clear legal duty to implement the pre-H.B. 122 version of R.C. 4123.54 if and when they are called upon to apply the presumption contained in the amended statute. Implicit in this assertion is the premise that the BWC should itself review the constitutionality of H.B. 122, conclude that it is unconstitutional, and disregard it. However, the BWC and the Industrial Commission do not even have the authority, much less a duty, to adjudicate the constitutionality of duly enacted legislation. Such a contention is contrary to well-settled law. *State ex rel. Columbus S. Power Co. v. Sheward* (1992), 63 Ohio St.3d 78, 81, 585 N.E.2d 380, 382 ("It is settled that an administrative agency is without jurisdiction to determine the constitutional validity of a statute"). It follows that, if mandamus is appropriate in the case at bar because the respondents, as administrative agencies, have a clear legal duty to follow only constitutional statutes, then mandamus is appropriate in every case where the constitutionality of a statute prescribing procedures or imposing duties upon any governmental official is questioned. I cannot accept as valid such a fundamental restructuring of the law of constitutional review.

**{¶76}** The relators do not allege facts supporting an exercise of this court's original jurisdiction to issue an extraordinary writ of mandamus. The case should therefore be dismissed.

III

Constitutionality

{¶77} The court should not reach the issue of the constitutionality of H.B. 122 at this time. It nevertheless has determined to do so. I therefore write to express my disagreement with the majority's resolution of this substantive issue as well.

{¶78} I acknowledge that reasonable minds may well differ as to the wisdom of the amendments to R.C. 4123.54 made by H.B. 122, now codified as R.C. 4123.54(B). However, in the absence of unconstitutionality, this court does not have authority to invalidate the policy judgments of the General Assembly as incorporated into statutory law.

{¶79} R.C. 4123.54(B) establishes rebuttable presumptions where a worker tests over prescribed drug or alcohol limits, or refuses drug testing after an injury. Therefore, the change accomplished by H.B. 122 does no more than reallocate the burden of going forward with evidence in workers' compensation claims where an issue of the worker's possible intoxication as a cause of the injury has been framed. In so doing, the General Assembly has placed the burden of proving a worker's condition where alcohol or illegal drug intoxication may have existed at the time of an injury upon the party most able to provide evidence of that condition. Such a change is well within the constitutional authority of the General Assembly, and the majority therefore errs in invalidating R.C. 4123.54(B).

{¶80} The majority reaches its conclusion of unconstitutionality based on its analysis of questions of statutory interpretation that have not been presented or fully adjudicated. The syllabus to the majority opinion herein states that "2000 Am.Sub.H.B. No. 122 * * * permits the warrantless drug and alcohol testing of injured workers." In drawing this conclusion the majority accepts relators' proposition that H.B. 122 creates rights in employers to demand, and a requirement in employees to submit to, drug testing. However, nothing in the language of the statute authorizes anyone, and specifically Ohio employers, to require employees

24

to submit to drug testing: the word "employer" appears nowhere in R.C. 4123.54(B).

**{¶81}** Missing from this rationale for its conclusion is any expression of concern by the majority for the workers whose health and safety may be jeopardized by the errant conduct of another employee who may be under the influence of alcohol or drugs. Why the extraordinary concern for an employee whose conduct may suggest a drug test is warranted at the expense of other employees whose conduct is appropriate?

**{¶82}** R.C. 4123.54(B) is drafted in the passive voice. It provides, for example, that the rebuttable presumptions created by the statute exist "provided that an employee *is given,* or *has been given* notice" of test results or the consequences of a refusal to be tested. (Emphasis added.) Similarly, the statute creates a rebuttable presumption where an employee "refuses to submit to a requested chemical test," but does not identify the person or persons who might make such a request. R.C. 4123.54(B)(5). It is only the relators' interpretive gloss on the statute that supports their premise that R.C. 4123.54(B) "permits" or requires testing. In fact, the statute does not do so, although it does rest on an *assumption* that drug testing has been, or will be, requested by some unidentified actor.

**{¶83}** Similarly, the conclusions made by the majority that "under H.B. 122, every Ohio worker injured on the job must submit to an employer-requested chemical test" and that the rebuttable presumption created in R.C. 4123.54(B) is "the hammer that forces an employee to take" a drug test are unfounded. R.C. 4123.54(B) does not *require* an injured employee to take a test—it imposes an evidentiary consequence to a worker's refusal to submit to a drug test. Any worker may refuse drug testing and choose instead to proceed with his claim, confident that his testimony, or that of others, would rebut the presumption of impairment or of impairment as a causal factor in his injury. The majority's contrary conclusions assume the existence of provisions that the General Assembly simply did not adopt.

**{¶84}** Several states, including Alaska, Utah, and Arizona, have in fact enacted statutes governing an employer's right to demand drug tests of its employees, and providing guidelines and employee protections for drug testing by employers.  See Alaska Stat. 23.10.600 et seq.; Utah Code Ann. 34-38-1 et seq.; Ariz.Rev.Stat.Ann. 23-493.01 et seq.  See, generally, Zarou, The Good, the Bad and the Ugly: Drug Testing by Employers in Alaska (1999), 16 Alaska L.Rev. 297.

**{¶85}** The General Assembly, however has not enacted legislation similar to the Alaska, Utah, and Arizona statutes, and the legality of an employer's ability to demand drug testing in Ohio is dependent upon the common law and any contractual obligations that may have been negotiated.  The relators in this case are, in effect, issuing a preemptive strike challenging the constitutionality of a statutory scheme that simply does not exist in Ohio statutory law.

**{¶86}** I therefore dissent from the majority's holding that R.C. 4123.54, as amended by H.B. 122, is unconstitutional.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

---

**COOK, J., dissenting.**

**{¶87}** I join the view expressed by the Chief Justice that the court should dismiss this cause based on the relators' lack of standing.

---

Stewart Jaffy & Associates, Stewart R. Jaffy and Marc J. Jaffy, for relators Ohio AFL-CIO and William Burga.

Steve E. Mindzak, for relators United Auto Aerospace & Agricultural Implement Workers of America, Region 2 and Region 2-B.

Betty D. Montgomery, Attorney General, Cheryl J. Nester, Assistant Attorney General, and Elise W. Porter, Assistant Solicitor, for respondents.

Philip J. Fulton & Associates, Philip J. Fulton, William A. Thorman III and Jonathan H. Goodman, in support of relators for amicus curiae Ohio Academy of Trial Lawyers.

Jillian S. Davis and Raymond Vasvari, in support of relators for amicus curiae American Civil Liberties Union of Ohio Foundation, Inc.

Cloppert, Portman, Sauter, Latanick & Foley, Frederic A. Portman and Christopher A. Flint, in support of relators for amicus curiae Ohio Education Association.

Joyce Goldstein & Associates, L.P.A., and Joyce Goldstein, in support of relators for amicus curiae Service Employees, International Union Local 47.

Joseph P. Sulzer, in support of relators for amicus curiae various Members of the Ohio General Assembly.

Crosby, O'Brien & Associates and Elizabeth A. Crosby, in support of respondents for amicus curiae Greater Cleveland Growth Association Council of Smaller Enterprises.

Garvin & Hickey, L.L.C., Preston J. Garvin and Michael J. Hickey; Vorys, Sater, Seymour & Pease L.L.P., Robin Obetz and Robert A. Minor; Bricker & Eckler, L.L.P., Thomas R. Sant and Kurtis A. Tunnell, in support of respondents for amici curiae Ohio Chamber of Commerce, Ohio Self-Insurers' Association, Ohio Chapter of the National Federation of Independent Business, Ohio Farm Bureau Federation, and Ohio Manufacturers' Association.

———————————