**The STATE of Ohio, Appellee,**

v.

**MACKEY, Appellant.**

[Cite as *State v. Mackey* (2001), 141 Ohio App.3d 604.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18423.

Decided March 30, 2001.

606

*Johnna M. Shia,* Montgomery County Assistant Prosecuting Attorney, for appellee.

*Arvin S. Miller,* Montgomery County Assistant Public Defender, for appellant.

WOLFF, Presiding Judge.

Jason H. Mackey appeals from a judgment of the Montgomery County Court of Common Pleas, which denied his motion to suppress.

The evidence presented at the suppression hearing established two different versions of the events in question. The state presented the following version of events through the testimony of Stephen Bergman, a Dayton police officer with ten years of experience. On February 3, 2000, Bergman and his partner were on patrol near the intersection of Lexington and Rosedale. They had been assigned to "saturate" that area, a known drug area, due to complaints of drug activity and robberies. A "mom and pop store" was located at the southeast corner of the intersection of Lexington and Rosedale. On that particular corner, Bergman had made several "buy bust" arrests involving crack cocaine, an arrest of a person with a handgun, and about ten other arrests. He had not made any arrests there, however, in the year prior to the incident.

While on patrol between 12:30 a.m. and 12:45 a.m., Bergman noticed several males standing in front of the store where a "No Loitering" sign was posted. Bergman drove past the individuals, allowing them to see the police cruiser, and circled around the block. When he drove back around to the front of the store, the group was still there. Bergman then drove into the store's parking lot. As Bergman and his partner exited their vehicle and began to approach the group, Bergman noticed Mackey start to "wander away" from the rest of the individuals. Bergman then saw Mackey "shove" his hands inside "the suspender part" of his bib overalls until his hands and forearms were out of sight. The disappearance of Mackey's hands and forearms drew Bergman's attention. Continuing to have his hands and forearms inside his bib overalls, Mackey turned his profile to Bergman, turned his back to Bergman, and then turned around and started walking back toward Bergman and the group.

Prior to the incident, Bergman had known who Mackey was because he was "well known" and had a reputation for "sling[ing] dope" and "carry[ing] guns." Bergman also knew that Mackey had been a named suspect in an aggravated robbery, involving a handgun, that had occurred at the same corner approximately two weeks prior to this incident. Seeing Mackey's hands and forearms disappear into his bib overalls, Bergman became concerned for his safety and decided to approach Mackey. Bergman testified that had Mackey kept walking

away from the group, he probably would have let him go because he and his partner had their "hands full" with the other individuals in the group.

As Bergman approached Mackey, he told him to remove his hands from the bib overalls and Mackey complied. Bergman then escorted Mackey away from the group and conducted a patdown of Mackey for weapons. Mackey was wearing "car hard [sic] type" bib overalls which were made of a thick and heavy material. Due to the thickness of these bib overalls, Bergman was unable to patdown Mackey "good enough to feel comfortable" that Mackey did not have a weapon. Bergman unhooked the buttons on Mackey's bib overalls and dropped the "bib portion down" to pat down Mackey's jeans and sweatshirt. When Bergman reached Mackey's buttocks, he felt an object that had different angles and edges to it. Bergman believed the object to be crack cocaine. Bergman handcuffed Mackey and told him that he was under arrest. Bergman then "worked [the] bag of crack [cocaine] up to the top" of Mackey's waistband and removed it. Mackey told Bergman that "he would just have that suppressed." Following the arrest, Bergman searched Mackey again and found $150 and some marijuana. Bergman also returned to the corner and found numerous plastic baggies with the ends pinched off on the ground, indicia of recent drug dealing.

On cross-examination, Bergman admitted that he had not seen any criminal activity before he had approached the group.

The defense's version of the events was presented through Mackey's testimony and differed from the state's version as follows. Around 11:45 p.m. on the night in question, Mackey went to the store at the corner of Lexington and Rosedale to purchase some cigars. After his purchase, he exited the store and joined a group of his friends on the corner who were "hanging out[,] * * * lollygagging, [and] having a conversation." Bergman and his partner drove into the store parking lot, "jumped out" of their cruiser, and told the individuals to "get on the wall" of the store. While Bergman's partner subdued another individual in the group, Bergman began "going down the line" searching the individuals. Eventually, he "grabbed" Mackey and tried to search him, but Mackey's overalls were "too heavy." Bergman then unhooked Mackey's overalls, pulled them down, "unfastened [Mackey's] jeans" and "pulled [them] down." Bergman proceeded to stick his ungloved finger inside the crack of Mackey's buttocks and move his finger from the bottom of his buttocks to the top of his buttocks. Thereafter, Bergman told Mackey that he was being arrested for "possession of drugs or something" and helped him get dressed. Mackey denied having had any crack cocaine in his possession, but he did admit that he had had $150 and some marijuana. Mackey also denied ever walking away from Bergman, stating, instead, that he had not moved as Bergman had approached the group and that he and Bergman had "looked face to face."

In February 2000, Mackey was indicted for possession of crack cocaine in an amount of one gram or less in violation of R.C. 2925.11(A). On March 22, 2000, Mackey filed a motion to suppress arguing that his Fourth Amendment rights had been violated by an unlawful search and seizure. A suppression hearing was held on April 26, 2000. On May 15, 2000, the trial court overruled Mackey's motion to suppress. Mackey's attorney then made an oral motion for reconsideration of the trial court's denial of Mackey's motion to suppress. The trial court overruled the motion for reconsideration on June 5, 2000.

In June 2000, Mackey entered a plea of no contest to the charged offense. On July 17, 2000, the trial court sentenced Mackey to up to five years of community control and various other sanctions.

Mackey now appeals the trial court's denial of his motion to suppress. He raises a single assignment of error:

"The trial court erred in overruling appellant's motion to suppress evidence recovered as a result of Officer Bergman's unconstitutional search and seizure of appellant."

Mackey argues that the trial court erred in overruling his motion to suppress because he was subjected to an unreasonable and unconstitutional search and seizure. In support of his argument, Mackey raises three issues. First, he argues that Bergman lacked a reasonable articulable suspicion of criminal activity to justify stopping Mackey. Second, he asserts that Bergman had no independent justification to search Mackey. Third, he claims that Bergman's patdown of Mackey exceeded the scope of a permissible patdown.

 "When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses." *State v. Clary* (Sept. 30, 1996), Lawrence App. No. 96CA7, unreported, 1996 WL 560522, citing *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982, certiorari denied (1992), 505 U.S. 1227, 112 S.Ct. 3048, 120 L.Ed.2d 915. Thus, "in its review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Clary, supra,* citing *State v. Guysinger* (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726, 727. The appellate court must, however, determine *de novo* whether the trial court's conclusions of law, based on those findings of fact, were correct. *Guysinger,* 86 Ohio App.3d at 594, 621 N.E.2d at 727.

In its denial of Mackey's motion to suppress, the trial court found the state's version of the events to be more credible. Our review of the record reveals that the state's version was supported by competent, credible evidence, *i.e.,* Bergman's

testimony at the suppression hearing. Thus, we accept the trial court's findings of fact and utilize them in our review of the trial court's conclusions of law.

Mackey first argues that Bergman lacked a reasonable articulable suspicion to justify stopping and detaining him because there was no evidence that criminal activity was afoot.

A police officer may conduct an investigatory detention of an individual without violating the Fourth Amendment if the officer has a reasonable suspicion that the individual is engaged in criminal activity. *State v. Shepherd* (1997), 122 Ohio App.3d 358, 364, 701 N.E.2d 778, 782, citing *Terry v. Ohio* (1968), 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–1885, 20 L.Ed.2d 889, 911. Reasonable suspicion has been defined as something that is more than an inchoate or unparticularized suspicion or hunch, but is less than the level of suspicion required for probable cause. *Id.* "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of syllabus, certiorari denied (1988), 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252. The totality of the circumstances must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87 88, 565 N.E.2d 1271, 1273, certiorari denied (1991), 501 U.S. 1220, 111 S.Ct. 2833, 115 L.Ed.2d 1002. In reviewing a police officer's actions, we must give due weight to his experience and training and view the evidence as it would have been understood by those in law enforcement. *Id.* at 88, 565 N.E.2d at 1273.

Bergman testified that as he had approached the group, Mackey had initially walked away from the group. Had Mackey continued to walk away, Bergman stated that he "probably" would not have pursued him due to the number of other individuals still on the corner. It was not until Mackey placed his hands and forearms inside his bib overalls, walked away from the group, turned his profile and back to Bergman, and reapproached the group that Bergman "keened" in on him. Bergman testified that as Mackey had reapproached the group, he had recognized him as a suspect in an aggravated robbery with a handgun that had occurred at the same corner approximately two weeks earlier. Bergman was a ten-year veteran of the Dayton Police Department. When asked what significance Mackey's actions had had to Bergman, he testified, "Well, I thought it was odd that he came back. That heightened things to another—escalated it to another level with those movements and what I know." Bergman stated that Mackey's actions had put him in fear that Mackey had had a weapon. Upon Mackey's return to the group, Bergman ordered Mackey to remove his hands and escorted him away from the group. At that point in time, the "*Terry* stop" occurred.

We believe that the facts support the trial court's conclusion that Bergman had a reasonable suspicion that Mackey was engaged in criminal activity. Aside from Mackey's suspicious movements, his reputation for dealing drugs and carrying a gun, and his alleged aggravated robbery with a handgun two weeks earlier, there were a number of other facts which supported the conclusion that Bergman had a reasonable suspicion to stop Mackey. Bergman testified that the corner was a "known drug area" to police officers and that he had made prior arrests on that exact corner for drugs and weapons. Further, Bergman and his partner had been specifically assigned to "saturate" that area due to complaints of drug dealing and robberies. He stated that in his experience with that corner, drug dealers would deal "right next to the store's door" and run inside the store when a police officer approached. Further, based upon Bergman's experience patrolling that area, he stated that his first suspicion when he had seen the group of individuals was that they were dealing drugs. Finally, the incident took place between 12:30 a.m. and 12:45 a.m. Thus, based upon the totality of the circumstances, we conclude that Bergman had a reasonable suspicion to stop Mackey.

Mackey also argues that the trial court erred in overruling his motion to suppress because Bergman lacked a reasonable suspicion to search him.

"Where a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others." *Bobo*, paragraph two of syllabus.

Based upon the totality of the circumstances, we believe that Bergman had a reasonable suspicion that Mackey was armed with a weapon. Bergman knew that Mackey had allegedly used a handgun about two weeks prior to the incident to commit a crime. Bergman also was aware of Mackey's reputation for dealing drugs and carrying guns. Most important, Mackey's actions of reapproaching the group *after* he had hidden his hands and forearms in his bib overalls, walked away, and turned his body away from the officers justified Bergman's suspicion and fear that Mackey was armed and that he might harm Bergman or his partner.

Mackey further claims that the patdown exceeded the scope of a permissible pat down. In support of his argument, he cites *State v. Sargent* (Nov. 20, 1998), Montgomery App. No. 17324, unreported, 1998 WL 801488.

As the Supreme Court of Ohio has stated:

"Under *Terry* and its progeny, the police may search only for weapons when conducting a pat down of the suspect. 'A search for weapons in

the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. * * * Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby * * *.' The protective pat down under *Terry* is limited in scope to this protective purpose and cannot be employed by the searching officer to search for evidence of crime. Obviously, once the officer determines from his sense of touch that an object is not a weapon, the pat down frisk must stop. The officer, having satisfied himself or herself that the suspect has no weapon, is not justified in employing *Terry* as a pretext for a search for contraband." (Citations and footnote omitted.) *State v. Evans* (1993), 67 Ohio St.3d 405, 414, 618 N.E.2d 162, 170, certiorari denied (1994), 510 U.S. 1166, 114 S.Ct. 1195, 127 L.Ed.2d 544.

In *Sargent,* a police officer detained a defendant who was wearing a " 'car heart [*sic*] tan jumpsuit' " with bulging pockets. *Sargent, supra.* Despite the officer's testimony that he had started to conduct a patdown search of the defendant, the trial court concluded that the officer had not conducted a patdown but, instead, had gone "straight for [the bulging] object in the [defendant's] pocket." *Id.* The trial court concluded that it had not been necessary for the officer to reach into the defendant's pocket to determine whether he had had a·weapon. *Id.* We affirmed the trial court's conclusion that the officer's actions had exceeded the scope of a permissible *Terry* search. *Id.*

The facts in *Sargent* can be distinguished from those in the case before us. In *Sargent,* the trial court concluded that the officer had immediately reached into the defendant's pockets, without even attempting to conduct a patdown search. In the case before us, Bergman attempted to conduct a patdown search but was unable to complete it to his satisfaction due to the heaviness of Mackey's overalls. It was only after his attempted patdown had proven unsuccessful that he unhooked Mackey's overalls. Thus, we are not persuaded by Mackey's argument that the holding in *Sargent* should apply to his case.

The state argues that this case is similar to *State v. Hamm* (Nov. 15, 1991), Huron App. No. H–90–37, unreported, 1991 WL 254061. In *Hamm,* while a police officer was conducting a patdown search of a defendant, he lifted each of the defendant's pant legs and looked inside of each boot he was wearing. *Hamm, supra.* The officer testified that he had lifted the defendant's pant legs because he had been unable to adequately search the defendant's lower legs for weapons because he had been wearing boots. *Id.* The court concluded that the officer had conducted a legitimate *Terry* search when he had lifted the defendant's pant legs and had looked inside his boots. *Id.*

Bergman testified as follows regarding his search of Mackey:

"Due to these bibs, which are basically work pants, they're kind of thick, I, I couldn't hardly pat him down. I couldn't do a good patdown, to feel comfortable that there wasn't a gun stuck somewhere.

"So, as I'm trying to pat him down through his clothing, I * * * disconnected [the overall buttons a]nd I dropped the bib portion down so I could feel secure to pat his inner clothing, which was like a sweat shirt and jeans."

The record clearly reveals that Bergman began his patdown on the outside of Mackey's overalls. Because Mackey's overalls were made of a thick and heavy material, however, Bergman was unable to adequately complete the patdown to assure himself that Mackey was not armed. *Terry* requires that a patdown be "limited to that which is necessary for the discovery of weapons." Without unhooking Mackey's overalls, Bergman stated that he could not have been sure that Mackey was unarmed. According to Bergman's testimony, he unhooked Mackey's overalls to search for weapons, not to search for contraband. Like the officer in *Hamm*, Bergman was unable to adequately search Mackey without going under his overalls. See, also, *State v. Featherston* (Sept. 27, 1999), Fairfield App. No. 99CA9, unreported, 1999 WL 976216, dismissed (2000), 87 Ohio St.3d 1492, 722 N.E.2d 525 (where police officer removed and searched defendant's baseball hat while conducting patdown search and the court concluded that the patdown had not exceeded the scope of a permissible *Terry* search, in part, because the stiffness of defendant's hat would have made a patdown of the hat impracticable). Thus, we do not believe that Bergman's patdown exceeded the permissible scope of *Terry* when he unhooked Mackey's overalls and searched the clothing underneath his overalls.

The assignment of error is overruled.

The judgment of the trial court will be affirmed.

*Judgment affirmed.*

GRADY and FREDERICK N. YOUNG, JJ., concur.

GRADY, Judge, concurring.

I agree that, on the record before us, the trial court was correct when it denied defendant-appellant's motion to suppress. However, because the form of search which revealed the crack cocaine went beyond the "limited search of the outer clothing for weapons" approved in *Terry v. Ohio* (1968), 392 U.S. 1, 24, 88 S.Ct. 1868, 1881–1882, 20 L.Ed.2d 889, 908, it raises concerns that should be addressed.

Officer Bergman was "justified in believing that the individual whose suspicious behavior he (was) investigating at close range (was) armed and presently

dangerous to the officer or to others." *Id.* Therefore, he was authorized to conduct a search "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments" that could be used in an assault. *Id.* at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 911. The issue presented concerns the *scope* of the search that Officer Bergman conducted.

*Terry* noted that a weapons search " 'must, like any other search, be strictly circumscribed by the exigencies which justify its initiation.' " *Id.* at 26, 88 S.Ct. at 1882, 20 L.Ed.2d at 908–909, quoting *Warden v. Hayden* (1967), 387 U.S. 294, 310, 87 S.Ct. 1642, 1651–1652, 18 L.Ed.2d 782, 794–794. The *Terry* court declined to develop the specific limitations which might be imposed, stating that "[t]hese limitations will have to be developed in the concrete factual circumstances of individual cases." *Id.* at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910, citing *Sibron v. New York* (1968), 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917.

Because the "car hard type overalls" which Defendant–Appellant wore over his other clothing prevented the kind of weapons search that *Terry* permits, it was reasonable for Officer Bergman to lower the bibs of the overalls and search inside for weapons. The scope of that search reasonably included areas within defendant-appellant's ready reach. Thus, the officer could search the inside of the back of defendant-appellant's overalls as well as the front, even though he had only seen defendant-appellant reach into the front.

The issue which this record does not address is why Officer Bergman chose to probe the cleavage between defendant-appellant's buttocks, where the crack cocaine was located. Indeed, the officer testified that the crack cocaine was "in his butt cheeks * * * where I say 98 percent of the drug dealers will keep it." The officer also testified that he's found crack cocaine in patdown searches "hundreds" of times. *Id.* It would be helpful to know how many times he found weapons concealed there, particularly any guns, knives, or clubs, or other similar instruments that a *Terry* patdown is intended to reveal. The lack of such experiences, as against his apparent success in locating drugs there, could support a conclusion that the officer's purpose was to locate contraband, not weapons, when he conducted that portion of his search.

As these comments might indicate, this court has reviewed numerous cases wherein crack cocaine was located in a search that probed the area between a suspect's buttocks. The nagging question, which has yet to be answered, is how weapons might reasonably be suspected to be there. *Terry* was concerned with a limited search of a suspect's outer garments, which the court said "must surely be an annoying, frightening, and perhaps humiliating experience." *Id.* at 25, 88 S.Ct. at 1882, 20 L.Ed.2d at 908. Searches of these far more private areas of a suspect's person can only be even more annoying, frightening, and humiliating. Some more explicit justification of them is warranted, in the context of *Terry*.