The STATE of Ohio, Appellee,

v.

CREMEANS, Appellant.

[Cite as *State v. Cremeans*, 160 Ohio App.3d 1, 2005-Ohio-928.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 20322.

Decided March 4, 2005.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Kristen A. Brandt, Assistant Prosecuting Attorney, for appellee.

Jeffrey S. Rezabek, for appellant.

BROGAN, Presiding Judge.

{¶ 1} James Cremeans appeals from his conviction and sentence following a no-contest plea to one count of burglary.

{¶ 2} In his sole assignment of error, Cremeans contends that the trial court erred in ordering him "to submit a sample for DNA testing and in failing to suppress it from use at trial."

{¶ 3} The record reflects that Cremeans was required to undergo a blood test while serving a prison sentence for aggravated robbery and aggravated burglary in October 1998. The Ohio Bureau of Criminal Investigations and Identification conducted DNA testing of the sample obtained and entered the results into a data bank. Cremeans subsequently was released from prison. Thereafter, in August 2001, Riverside police found blood at the scene of a burglary on Harshman Road. Testing allegedly revealed that DNA in the blood at the scene matched DNA in the 1998 sample provided by Cremeans.

{¶ 4} In July 2003, a grand jury indicted Cremeans for the Harshman Road burglary. The state then moved to compel him to provide a second blood or saliva sample to confirm a match with the DNA extracted from the blood collected at the crime scene.

{¶ 5} Cremeans responded with a motion to suppress the 1998 blood sample and resulting DNA information, arguing that the state had extracted the blood in violation of his Fourth Amendment rights. Cremeans also opposed the state's motion to compel a second blood or saliva test. In separate entries, the trial court overruled Cremeans's motion to suppress and sustained the state's motion to compel a second blood or saliva test for purposes of DNA analysis. Following the trial court's rulings, Cremeans entered a no-contest plea to the burglary charge and received a sentence of five years of community control. This timely appeal followed.

{¶ 6} In his assignment of error, Cremeans contends that the trial court erred in ordering him "to submit a sample for DNA testing and in failing to suppress it from use at trial." This assignment of error appears to address the second blood or saliva sample—the subject of the state's motion to compel—which was the only sample the trial court ordered Cremeans to submit for DNA testing.[1]

{¶ 7} Cremeans advances two arguments with regard to the second sample. First, he claims that the DNA results from the 1998 blood test were the sole basis for a finding of probable cause to support the trial court's order compelling him to provide a second sample. Cremeans asserts, however, that the state cannot authenticate the results of the 1998 sample because of a faulty chain of custody. Absent proper authentication, he reasons, the 1998 sample could not provide the probable cause needed to justify the trial court's order compelling him to provide a second sample.

{¶ 8} In a second argument, Cremeans contends that the taking of the 1998 sample violated his constitutional right to be free from unreasonable searches. In particular, he insists that the 1998 blood test and DNA analysis were undertaken without his consent and without individualized suspicion of criminal wrongdoing in violation of the Fourth Amendment. Given his belief that the 1998 blood test and DNA analysis were unconstitutionally obtained, Cremeans contends that the results of that procedure could not be used to justify the second test and DNA analysis ordered by the trial court in response to the state's motion to compel. Thus, he argues that the results of the 1998 DNA analysis should

---

1. As noted above, the 1998 blood sample was taken while Cremeans remained incarcerated on unrelated charges. The trial court played no part in the taking of that blood sample for DNA testing.

4

have been suppressed, and the state's motion to compel a second test should have been overruled.

{¶ 9} Upon review, we are unpersuaded by either of the foregoing arguments. In his brief to the trial court, Cremeans alleged that "the reason the State is seeking a second blood sample from Defendant is that the State expects to be unable to authenticate the blood sample already in its possession." Notably, however, the record does not portray the authentication problem alleged by Cremeans. Absent any evidence in the record that the state's chain of custody is defective, Cremeans cannot prevail on his first argument.

{¶ 10} We note too that Cremeans had been indicted for the Harshman Road burglary prior to the trial court ordering him to undergo a second test. " '[A]n indictment returned by a [g]rand [j]ury constitutes prima facie evidence of probable cause under Ohio law.' " *State v. Nixon* (Apr. 25, 2001), Lorain App. Nos. 00CA007638 and 00CA007624, 2001 WL 422885, quoting *Inmates' Council-matic Voice v. Rogers* (C.A.6, 1976), 541 F.2d 633, 635. Cremeans provided the trial court with no evidence to rebut the presumption of probable cause that his indictment created. Thus, we find no error in the trial court's reasoning that the indictment established probable cause for an order requiring Cremeans "to produce nontestimonial evidence, i.e., a DNA sample, to attempt to match evidence at the scene."[2]

{¶ 11} Cremeans's second argument raises a more significant issue. There he contends that the 1998 blood test and DNA analysis were undertaken without his consent and without individualized suspicion of criminal wrongdoing in violation of his Fourth Amendment rights. This argument challenges the constitutionality of R.C. 2901.07, which requires DNA testing of certain offenders who have been sentenced to incarceration, without regard to their consent or the existence of any reason to believe that they have committed a crime other than the offense for which they have been incarcerated.

{¶ 12} All 50 states and the federal government have enacted statutes similar to R.C. 2901.07. Appellate courts reviewing Fourth Amendment challenges to these statutes uniformly have held that mandatory collection of DNA samples from individuals such as Cremeans does not constitute an unlawful search and seizure, even without individualized suspicion of involvement in some other crime.[3] See, e.g., *State v. Peppers* (2004), 352 Ill.App.3d 1002, 1004–1005, 288

---

2. The test also appears to have been authorized by R.C. 2317.47, which provides: "Whenever it is relevant in a civil or criminal action or proceeding to determine the * * * identity of any person, the trial court on motion shall order any party to the action and any person involved in the controversy or proceeding to submit to one or more blood-grouping tests."

3. The only courts to declare such statutes unconstitutional are the Eastern District of California in *United States v. Miles* (E.D.Cal.2002), 228 F.Supp.2d 1130, and the Ninth Circuit

Ill.Dec. 502, 817 N.E.2d 1152 ("Defendant is faced with a tidal wave of authority against his position. Every court of review that has decided the issue has upheld the DNA testing statute[s]"). Indeed, this court's research has revealed dozens of state and federal court decisions rejecting constitutional challenges virtually identical to the one Cremeans advances herein. See, e.g., *United States v. Kincade* (C.A.9, 2004), 379 F.3d 813, 830–831 (en banc) (citing nearly three dozen state and federal court decisions upholding DNA-collection and testing statutes).

{¶ 13} Having reviewed the substantial case law on the subject, we now add our voice to the growing weight of authority and hold that Ohio's DNA-collection statute does not violate Cremeans's Fourth Amendment right to be free from unreasonable searches. We begin our analysis by acknowledging that compelled extraction and testing of blood qualify as searches under the Fourth Amendment. *State v. Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, 802 N.E.2d 1127, at ¶ 23; *State ex rel. Ohio AFL–CIO v. Ohio Bur. of Workers' Comp.*, 97 Ohio St.3d 504, 508, 2002-Ohio-6717, 780 N.E.2d 981; *Skinner v. Ry. Labor Executives' Assn.* (1989), 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639. Of course, the Fourth Amendment prohibits only those searches that are unreasonable. Thus, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 108–109, 98 S.Ct. 330, 54 L.Ed.2d 331, quoting *Terry v. Ohio* (1968), 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 14} "In general, the reasonableness of a particular search or practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *State ex rel. Ohio AFL–CIO*, supra, 97 Ohio St.3d 504, 2002-Ohio-6717, 780 N.E.2d 981, at ¶ 24, quoting *Skinner*, supra, 489 U.S. at 619, 109 S.Ct. 1402, 103 L.Ed.2d 639; see, also, *Bell v. Wolfish* (1979), 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"); *United States v. Knights* (2001), 534 U.S. 112, 118–119, 122 S.Ct. 587, 151 L.Ed.2d 497, quoting *Wyoming v. Houghton* (1999), 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 ("'The touchstone of the

Court of Appeals in *United States v. Kincade* (2003), 345 F.3d 1095. We note, however, that the Ninth Circuit subsequently vacated the panel ruling in *Kincade* and issued an en banc decision finding the federal DNA-collection statute constitutional, thereby effectively overruling *Miles* as well. See *United States v. Kincade* (C.A.9, 2004), 379 F.3d 813 (en banc).

Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests' ").

{¶ 15} Although a search ordinarily will be found unreasonable in the absence of a warrant issued on probable cause, a warrant is not always indispensable. Even the lesser threshold of individualized suspicion may not be required for a search to be deemed reasonable. " 'In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.' " *State ex rel. Ohio AFL–CIO*, supra, 97 Ohio St.3d 504, 2002-Ohio-6717, 780 N.E.2d 981, at ¶ 26, quoting *Skinner*, supra, 489 U.S. at 624, 109 S.Ct. 1402, 103 L.Ed.2d 639; see, also, *Natl. Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (recognizing "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance"); *United States v. Martinez–Fuerte* (1976), 428 U.S. 543, 560–561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (recognizing that although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,] * * * the Fourth Amendment imposes no irreducible requirement of such suspicion").

{¶ 16} In the context of the DNA statutes, courts have followed one of two analytical approaches to dispense with the normal requirement of probable cause or at least individualized suspicion of wrongdoing to justify the collection and testing of blood. Some courts, including the trial court in the present case, have determined that the DNA profiling fits within the "special needs" doctrine, which permits a search without a warrant or individualized suspicion when the primary purpose of the search goes beyond the ordinary need for law enforcement. See, e.g., *Steele*, supra, 155 Ohio App.3d 659, 2003-Ohio-7103, 802 N.E.2d 1127, at ¶ 31–46.

{¶ 17} In recent years, the U.S. Supreme Court has applied the special-needs doctrine in a variety of contexts with differing results. Most recently, the court upheld the constitutionality of a highway checkpoint used by police to obtain information from motorists about an unsolved crime. *Illinois v. Lidster* (2004), 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843. Applying the special-needs doctrine, the *Lidster* majority reasoned that the primary purpose of the checkpoint was not to determine whether a vehicle's occupants were committing a crime, but to request their help in solving a crime most likely committed by someone else. In a number of other cases, the court has upheld suspicionless

searches conducted to further important non-law-enforcement objectives. See *Pottawatomie Cty. Indep. School Dist. Bd. of Edn. v. Earls* (2002), 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (upholding the suspicionless drug testing of students participating in extracurricular activities); *Vernonia School Dist. 47J v. Acton* (1995), 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (upholding a suspicionless drug-testing program for student athletes); *Natl. Treasury Employees Union*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (upholding suspicionless drug testing of certain government officials).

{¶ 18} In contrast to *Lidster*, the court invalidated a highway checkpoint intended to interdict illegal drugs in *Indianapolis v. Edmond* (2000), 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333. In *Edmond*, the majority determined that the primary purpose of the checkpoint was to uncover evidence of ordinary criminal wrongdoing. As a result, the court concluded that the checkpoint violated the Fourth Amendment in the absence of individualized suspicion of wrongdoing. Thereafter, in *Ferguson v. Charleston* (2001), 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205, the court invalidated a public hospital's nonconsensual drug-testing program for pregnant women. In rejecting the government's special-needs argument, the majority concluded that the immediate purpose of the testing was to collect evidence for law-enforcement purposes.

{¶ 19} Although the U.S. Supreme Court has not addressed the constitutionality of suspicionless DNA profiling of convicted individuals, some courts have drawn on the special-needs cases to find the testing permissible under the Fourth Amendment. In *Steele*, supra, the First District Court of Appeals employed the special-needs rationale to reject a challenge to the constitutionality of Ohio's DNA statute. In so doing, the *Steele* court reasoned:

{¶ 20} "Based on the language of *Ferguson*, federal courts have concluded that a distinction exists between a statute's ultimate purpose and its primary purpose. While the ultimate purpose in obtaining a DNA sample from a person is to assist law enforcement, the statute's immediate and primary purpose is to fill and maintain a DNA database, a purpose distinct from the regular needs of law enforcement.

{¶ 21} "*Ferguson* and *Edmond* both involved programs in which a search was undertaken to produce evidence that the searched individual had committed a particular crime. The investigation of an identifiable crime is a core law enforcement activity. For this sort of law enforcement function, courts require probable cause or individualized suspicion before law enforcement authorities are permitted to conduct a search or seizure. * * *

{¶ 22} "But the courts have stated that DNA statutes are not themselves designed to discover and produce evidence of a specific individual's criminal wrongdoing. A DNA sample is evidence only of an individual's genetic code,

which does not, on its own, show the commission of a crime. Unlike a urinalysis that can reflect the presence of illegal substances, the DNA sample only offers the potential to link the donor with a crime. The samples are maintained in the database without reference to the individual, and only a small percentage of the DNA samples are ever linked to any specific crime. * * * 'For these reasons, it is difficult to say that the DNA data bank program is one whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing.' *Nicholas* [*v. Goord* (Feb. 6, 2003), S.D.N.Y. No. 01Civ.7891(RCC)(GWG), 2003 WL 256774].

{¶ 23} "Further, searches conducted pursuant to DNA statutes have two purposes that go beyond the normal need for law enforcement. First, the searches contribute to the creation of a more accurate criminal justice system. This increased accuracy may ultimately exonerate persons who have been, or who will be, wrongly convicted of, or charged with, a crime. Second, the searches allow for a more complete database, which will assist law enforcement agencies in solving future crimes that have not yet been committed. In fact, the DNA statutes have a purpose, to help solve future crimes, that is unlike any other statute that has ever been before the United States Supreme Court. Thus, the statutes necessarily authorize searches that go beyond the normal need for law enforcement. * * *

{¶ 24} "Of course, an individual's DNA sample may ultimately be used for law enforcement purposes. Purportedly special-needs searches that may ultimately be used for law enforcement purposes are more likely to pass Fourth Amendment muster if they are conducted in a uniform, nondiscretionary manner. Under the DNA statutes at issue in these federal cases, no discretion at all existed. All persons convicted of the qualifying offenses had to provide DNA samples. Thus, traditional concerns of probable cause and reasonable suspicion were minimized by the blanket approach to testing. * * *

{¶ 25} "R.C. § 2901.07 is identical in all important respects to the federal statutes at issue in these cases. Consequently, the same reasoning applies in this case. We hold that the primary purpose of the search authorized by R.C. § 2901.07 goes .beyond the needs of ordinary law enforcement. Therefore, it meets the special-needs test set forth in *Edmond* and *Ferguson.*" *Steele*, supra, 155 Ohio App.3d 659, 2003-Ohio-7103, 802 N.E.2d 1127, at ¶ 41–467.

{¶ 26} After finding that the suspicionless search required by Ohio's DNA statute is motivated by special needs beyond law enforcement, the *Steele* court proceeded to apply a traditional Fourth Amendment balancing test to assess the reasonableness of the search in light of the government's special needs. Id. at ¶ 47–50. In so doing, the First District balanced the minimally intrusive nature of drawing blood, the reduced expectation of privacy possessed by convicted felons, and the special needs discussed above. After weighing these consider-

ations, the *Steele* court held that the search authorized by R.C. 2901.07 is reasonable under the Fourth Amendment. Id. Numerous state and federal courts have employed essentially the same analysis to uphold similar statutes. See *Roe v. Marcotte* (C.A.2, 1999), 193 F.3d 72, 79–82; *Green v. Berge* (C.A.7, 2004), 354 F.3d 675, 679; *United States v. Kimler* (C.A.10, 2003), 335 F.3d 1132, 1146; see, also, *Kincade,* supra, 379 F.3d at 830–831 (citing additional cases).

{¶ 27} Other courts, however, have charted a different course in finding DNA statutes constitutional. These courts bypass the special-needs analysis in favor of a pure totality-of-the-circumstances or traditional balancing-of-interests test.[4] Regardless of whether the suspicionless searches mandated by DNA statutes are motivated by a law-enforcement purpose, these courts find them constitutional in light of the vastly reduced expectation of privacy enjoyed by a prisoner.[5] Whereas special needs of law enforcement may justify dispensing with the

---

4. In *Steele,* the First District Court of Appeals interpreted the U.S. Supreme Court's decisions in *Edmond* and *Ferguson* as mandating a two-part inquiry to determine whether a DNA statute survives review under the Fourth Amendment. According to the First District, a court first must apply the special-needs doctrine and determine whether the statute satisfies a non-law-enforcement purpose. Only if so may it then proceed to determine whether the compelled testing is reasonable under a traditional Fourth Amendment balancing approach. *Steele,* supra, 155 Ohio App.3d 659, 2003-Ohio-7103, 802 N.E.2d 1127, at ¶ 34, 40. As we will discuss more fully infra, however, numerous courts have reviewed DNA statutes, post *Edmond* and *Ferguson,* under a pure totality-of-the circumstances or balancing test without regard to any "special needs" of the government. We find nothing in *Edmond* or *Ferguson* to preclude such an approach. As one federal court recently recognized: "It is dubious logic to suggest that by applying the special needs test to the particular searches in *Edmond* and *Ferguson,* the Supreme Court implied that it should be used to analyze *all* searches. This is particularly true * * * with convicted felons currently serving out their terms. At best *Edmond* and *Ferguson* can be read to suggest that with respect to collecting DNA samples from the general population, one might have to show some special need. As to prisoners who have little expectation of privacy, however, there is no reason why such a showing is required." (Emphasis sic.) *Nicholas v. Goord* (June 24, 2004), S.D.N.Y. No. 01Civ.7891(RCC)(GWG), 2004 WL 1432533; see, also, *Kincade,* supra, at 832 ("As we have stressed, neither *Edmond* nor *Ferguson* condemns suspicionless searches of conditional releasees in the absence of a demonstrable 'special need' apart from law enforcement. Indeed, *Ferguson* distinguished itself from cases addressing the constitutionality of parole and probation searches—thus recognizing a constitutionally significant distinction between searches of conditional releasees and searches of the general public, and laying the framework for a jurisprudentially sound analytic division between these two classes of suspicionless searches").

5. Some courts also extend this reasoning to probationers and parolees. In *Kincade,* supra, 379 F.3d at 834–835, for example, the Ninth Circuit concluded that a conditional releasee's "severely constricted expectations of privacy relative to the general citizenry" and "the government's concomitantly greater interest in closely monitoring and supervising conditional releasees, is in turn sufficient to sustain suspicionless searches of [a releasee's] person and property even in the absence of some non-law enforcement 'special need'—at least where such searches meet the Fourth Amendment touchstone of reasonableness as gauged by the totality of the circumstances." As applied to individuals such as Cremeans, who were incarcerated when their blood was drawn for DNA testing, the foregoing logic has even more force because inmates possess fewer privacy rights than probationers or parolees.

requirement of probable cause or individualized suspicion in the case of searches involving ordinary citizens, courts adopting this second analytical approach have concluded that a prisoner's diminished expectation of privacy, particularly as to his identity, is a key fact that also obviates the need for individualized suspicion of wrongdoing.

{¶ 28} In an early case assessing the constitutionality of compelled DNA testing, the Fourth Circuit Court of Appeals declined to apply the special-needs analysis discussed above and followed the pure totality-of-the-circumstances approach to assess reasonableness. In *Jones v. Murray* (C.A.4, 1992), 962 F.2d 302, the court perceived cases involving the rights of inmates as a category to which the usual Fourth Amendment requirements of probable cause or individualized suspicion do not apply. Id. at 307, fn. 2. Instead, the Fourth Circuit found that an inmate's diminished expectation of privacy eliminates the need for some quantum of individualized suspicion to justify drawing blood for DNA analysis. In support, the *Jones* court reasoned:

{¶ 29} "We have not been made aware of any case * * * establishing a per se Fourth Amendment requirement of probable cause, or even a lesser degree of individualized suspicion, when government officials conduct a limited search for the purpose of ascertaining and recording the identity of a person who is lawfully confined to prison. This is not surprising when we consider that probable cause had already supplied the basis for bringing the person within the criminal justice system. With the person's loss of liberty upon arrest comes the loss of at least some, if not all, rights to personal privacy otherwise protected by the Fourth Amendment. Thus, persons lawfully arrested on probable cause and detained lose a right of privacy from routine searches of the cavities of their bodies and their jail cells, as do convicted felons. Even probationers lose the protection of the Fourth Amendment with respect to their right to privacy against searches of their homes pursuant to an established program to ensure rehabilitation and security.

{¶ 30} "Similarly, when a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of "booking" procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. Thus a tax evader is fingerprinted just the same as is a burglar. While we do not accept even this small level of intrusion for free persons without Fourth Amendment constraint, the same protections do not hold true for those

lawfully confined to the custody of the state. As with fingerprinting, therefore, we find that the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from incarcerated felons for the purpose of identifying them." (Citations omitted.) Id. at 306–307.

{¶ 31} After dispensing with the argument that individualized suspicion is a constitutionally mandated prerequisite to compelled DNA testing, the *Jones* court proceeded to conduct a traditional totality-of-the-circumstances or balancing test to determine the Fourth Amendment reasonableness of extracting and testing inmates' blood. Upon weighing the "slight intrusion" of a blood test against "the government's interest in preserving a permanent identification record of convicted felons for resolving past and future crimes," id., the Fourth Circuit struck the balance in favor of the government. In so doing, the court stressed the value of DNA as an identification tool for law enforcement:

{¶ 32} "It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

{¶ 33} "Thus, in the case of convicted felons who are in custody of the Commonwealth, we find that the minor intrusion caused by the taking of a blood sample is outweighed by Virginia's interest, as stated in the statute, in determining inmates' 'identification characteristics specific to the person' for improved law enforcement." (Citations omitted.) Id., 962 F.2d at 307; see, also, *Landry v. Atty. Gen.* (1999), 429 Mass. 336, 350, 709 N.E.2d 1085 ("We are concerned in this case with convicted persons who have a low expectation of privacy in their identity, and a new, and validated, technology which can, by means of a properly performed minimally invasive test, obtain and preserve an extremely accurate record of identification. * * * The minor intrusion of a blood test is outweighed by the strong State interest in preserving a positive recorded identification of convicted persons").

{¶ 34} In the years since the Fourth Circuit decided *Jones,* numerous other courts have employed essentially the same analysis to find suspicionless DNA testing reasonable under the Fourth Amendment without regard to any "special needs" of the government. In *Groceman v. U.S. Dept. of Justice* (C.A.5, 2004), 354 F.3d 411, for example, the Fifth Circuit Court of Appeals eschewed a special-needs analysis and upheld the federal DNA act under a traditional totality-of-the-circumstances approach, reasoning:

{¶ 35} "Courts may consider the totality of circumstances, including a person's status as an inmate or probationer, in determining whether his reasonable expectation of privacy is outweighed by other factors. Though, like fingerprinting, collection of a DNA sample for purposes of identification implicates the Fourth Amendment, persons incarcerated after conviction retain no constitutional privacy interest against their correct identification. The DNA Act, accordingly, does not violate the Fourth Amendment, and its application does not infringe these plaintiffs' constitutional rights." (Citations omitted.) Id. at 413–414.

{¶ 36} Similarly, both the Ninth and the Tenth Circuit Court of Appeals have relied on a pure totality-of-the-circumstances analysis to uphold compelled DNA profiling of convicted offenders without the need for individualized suspicion of wrongdoing and without regard for any special needs of the government beyond ordinary law enforcement. See *Kincade,* supra, 379 F.3d at 832–839;[6] *Boling v. Romer* (C.A.10, 1996), 101 F.3d 1336, 1340; see, also, *Green,* supra, 354 F.3d at 679–680 (Easterbrook, J., concurring) ("Testing prisoners' blood, urine, saliva, or hair for drugs is routine and does not require individual suspicion. DNA is present in all living cells, so it may be obtained from any of the blood or other samples regularly collected from prisoners. * * * [L]ike other specimens the inmates' blood may be put to multiple uses, including preservation of DNA, for the fourth amendment does not control how properly collected information is deployed. Use of DNA is in this respect no different from use of a fingerprint; only the method of obtaining the information differs, and for prisoners that is a

---

**6.** In *Kincade,* the Ninth Circuit acknowledged that the U.S. Supreme Court has never decided whether suspicionless, law-enforcement-oriented searches of prisoners, probationers, or parolees violate the Fourth Amendment. *Kincade,* supra, 379 F.3d at 830. The *Kincade* court then drew upon and extended the reasoning of *United States v. Knights* (2001), 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497, wherein the court had upheld a law-enforcement oriented search of a probationer based on mere "reasonable suspicion" of criminal activity. In its ruling, the *Knights* court also had recognized the possibility that a conditional releasee's reasonable expectation of privacy might be so diminished "that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment." Id. at 120, 122 S.Ct. 587, 151 L.Ed.2d 497, fn. 6. Having found that the search in *Knights* was supported by reasonable suspicion, the court had declined to resolve this issue. In *Kincade,* however, the Ninth Circuit did address this issue in the context of the federal DNA statute and found that the suspicionless searches mandated by the statute were constitutional under a traditional Fourth Amendment balancing test.

distinction without importance"). A number of state and federal courts nation-wide are in accord with the foregoing reasoning. See *Kincade*, 379 F.3d at 831 (citing cases).

{¶ 37} Having reviewed the two competing analytical approaches to assessing the constitutionality of DNA-testing statutes, we cast our lot with those courts employing a straight totality-of-the-circumstances or balancing-of-interests approach without regard to whether R.C. 2901.07 serves some special need beyond normal law enforcement. While not precluding the possibility that Ohio's statute might survive scrutiny under the special-needs doctrine, we agree with the Ninth Circuit Court of Appeals' recent conclusion that reliance on a pure totality-of-the-circumstances reasonableness analysis to uphold mandatory DNA testing of convicted offenders "both comports with the Supreme Court's recent precedents and resolves this appeal in concert with the requirements of the Fourth Amendment." *Kincade*, supra, 379 F.3d at 832.

{¶ 38} But regardless of whether we interpret R.C. 2901.07 as serving some special need distinct from ordinary law enforcement, as the trial court did, or whether we perceive the statute as furthering a traditional law-enforcement objective, the conclusion is the same: the compelled extraction of Cremeans's blood or saliva for DNA analysis does not violate his Fourth Amendment rights. Under the special-needs approach, a key consideration in the Fourth Amendment balancing of interests is a finding that the DNA analysis is being conducted primarily for non-law-enforcement purposes. On the other hand, under the pure totality-of-the-circumstances approach that we favor, an inmate's reduced expectation of privacy is a paramount consideration when balancing competing interests to find the DNA testing reasonable under the Fourth Amendment.

{¶ 39} As one appellate court astutely has observed, however, "[r]egardless of which analytic approach we follow, we see a common thread that leads to the conclusion the Fourth Amendment is not offended by the statute. Incarcerated felons have a substantially diminished expectation of privacy. The testing, by needle or swab, is minimally intrusive. The State is not investigating a particular or specific crime. It is conducting a technologically accurate identification procedure that will enhance the administration of justice—reaching back to solve past crimes and extending forward to identify future offenders, convicting the guilty and acquitting the innocent." *Peppers*, supra, 352 Ill.App.3d at 1007, 288 Ill.Dec. 502, 817 N.E.2d 1152. We agree with this assessment. Consequently, based on the reasoning and citation of authority set forth above, we hold that R.C. 2901.07, which requires DNA testing of offenders sentenced to incarceration, does not violate Cremeans's Fourth Amendment right to be free from unreasonable searches. As a result, the trial court did not err in overruling his motion to suppress the DNA results from his 1998 blood test.

14

{¶ 40} Cremeans's sole assignment of error is overruled, and the judgment of the Montgomery County Common Pleas Court is affirmed.

Judgment affirmed.

WOLFF and GRADY, JJ., concur.