OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Demetric Earl Gillis, filed October 24, 2006. On April 21, 2006, Gillis was indicted on one count of possession of crack cocaine (more than one gram but less than five grams), in violation of R.C. 2925.11(A), and one count of possession of crack cocaine in violation of R.C. 2925.11(A) (less than one gram). On May 3, 2006, Gillis filed a Motion to Suppress "the alleged crack *Page 2 
cocaine that forms the basis of the charge against" him and any "oral or written statements taken from or made by Mr. Gillis to any law enforcement officer or agent." On May 15, 2006 the trial court held a hearing on the motion during which Detective Gregory H. Gaier, Sergeant Mark A. Spires, Detective Shawn Cople and Detective David L. House of the Dayton Police Department testified for the State of Ohio. Gillis moved to continue the hearing to provide additional witnesses, and the court granted a continuance until July 10, 2006. At that time, two juvenile boys, James Davidson and Jamal McShann, testified for Gillis. On September 6, 2006, the trial court overruled the motion to suppress.
 {¶ 2} The events giving rise to this matter began on March 1, 2006, when House, Emerson and Spires were on duty in marked cruisers in the area of West Stewart Street and Wisconsin Boulevard in the City of Dayton, Ohio. The officers were patrolling an area known for drug activity, and they observed Gillis and David Hoskins approach a car driven by James Baker. Gillis reached his hands into the vehicle, and Spires believed that a drug transaction occurred. After briefly following Baker's car, Spires pulled it over. Baker told Spires he had purchased .05 grams of crack cocaine from Gillis and that Gillis still had some drugs in a baggie.
 {¶ 3} Spires relayed this information to the other officers who continued to observe Gillis. Spires then joined the other officers at the intersection where Gillis and Hoskins remained. Spires, House, and Detective Shawn Emerson exited their cruisers and approached Gillis and Hoskins, who in turn ran into the nearby Dana Market. The store was open for business.
 {¶ 4} Gillis was apprehended inside the store, and during a pat down, a knife was removed from Gillis' pocket. Gillis was handcuffed due to recovery of the knife. House *Page 3 
continued checking the area between Gillis' buttocks and felt a hard object there which was in fact crack cocaine. House worked the crack cocaine up to the waist band of Gillis' pants and then removed it with a plastic bag provided by the store clerk.
 {¶ 5} Davidson, age 11, and McShann, age 15, testified that they were in the store when the pat down occurred. According to the boys, once Gillis was handcuffed, he was put on the floor and his sweatpants and underwear were pulled down. Davidson and McShann testified that they observed one of the officers retrieve something from Gillis` "butt." McShann testified that the officer made jokes; "When he was pulling whatever he * * *pulled out of his butt. He was like he having a baby. It's a boy."
 {¶ 6} Gillis argued that the manual strip search of Gillis' buttocks was unreasonable, in violation of his Fourth Amendment rights and beyond the scope of a Terry Stop. Gillis also argued that the strip search of Gillis violated R.C. 2933.32.
 {¶ 7} The court determined that the "officers had probable cause to believe that the Defendant had committed the offense of sale of crack cocaine and had possession of crack cocaine. This is not a Terry Stop case. Officers had probable cause to believe that the Defendant had committed a felony. This was not a mere suspicion or frisk to protect the officers (Terry Stop).
 {¶ 8} "While it is true the officers patted Gillis down for weapons, which is part of typical police procedure to protect themselves at the time of an arrest, and that they did find a knife. During the pat down, Detective House felt a hard object in the buttocks area of Mr. Gillis, which Detective House thought might be a weapon or it could be the contraband crack cocaine. The officers had observed what appeared to be a drug transaction, the purchaser, Mr. Baker, had indicated he had bought crack cocaine from Mr. Gillis, and that *Page 4 
Gillis still had some left in a plastic bag on his person. This gave the officers probable cause to search his person for crack cocaine.
 {¶ 9} "* * *
 {¶ 10} "Even if one were to believe the juvenile boys' testimony, that the officer pulled Mr. Gillis' sweats down, not his underpants, and proceed to push up the package containing the crack cocaine out of his buttocks area, the Court does not consider this particular search under the circumstances to be unreasonable under the Standards of State.vDarden, supra. After Gillis' arrest, the officers under the circumstances at that time (already had found a knife on Gillis), that the act of removing the hard object from Gillis' buttocks was reasonable under the Fourth Amendment. Although, it might have been better if the officers had perhaps waited to take Mr. Gillis back to the police department to remove the crack cocaine from the plastic bag in his buttocks area, the Court does not find that the search as conducted in this case was unreasonable under the Fourth Amendment standards. There was no invasion of the body, the Defendant was not stripped naked or embarrassed in that manner, and there was minimal invasion of his private area by merely sliding the plastic bag up out of the rear of his underwear."
 {¶ 11} Gillis asserts two assignments of error. His first assignment of error is as follows:
 {¶ 12} "THE TRIAL COURT ERRED WHEN IT OVERRULED MR. GILLIS' MOTION TO SUPPRESS BECAUSE THE SEARCH OF MR. GILLIS' BUTTOCKS AREA VIOLATED HIS FOURTH AMENDMENT RIGHTS"
 {¶ 13} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the *Page 5 
trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." (Internal citations omitted). State v.Purser, Greene App. No. 2006 CA 14, 2007-Ohio-192.
 {¶ 14} "The Fourth Amendment bars unreasonable searches and seizures." (Citations omitted). State v. Turner (Feb. 4, 2000), Montgomery App. No. 17801. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.`" State v. Cremeans, 160 Ohio App.3d 1,825 N.E.2d 1124, 2005-Ohio-928 (internal citations omitted).
 {¶ 15} A strip search is an "inspection of the genitalia, buttocks, breasts, or undergarments of a person that is preceded by the removal or rearrangment of some or all of the person's clothing that directly covers the person's genitalia, buttocks, breasts, or undergarments." R.C. 2933.23(A)(2).
 {¶ 16} The trial court determined that the officers did not conduct a strip search of Gillis and that "the defendant was not stripped naked or embarrassed in that manner." *Page 6 
Given the events that the officers witnessed, Gillis' Fourth Amendment rights were not violated; the officers witnessed Gillis' participation in what they believed to be a drug transaction, Baker told them he had purchased drugs from Gillis and that Gillis still had crack on his person, Gillis attempted to flee from the officers, and he was armed with a knife. We defer to the trial court judge who is in the best position to evaluate the credibility of the officers and the boys who testified. Since Gillis' Fourth Amendment rights were not violated by a strip search, the trial court did not err in overruling Gillis' motion to suppress. Gillis' first assignment of error is overruled.
 {¶ 17} Gillis' second assignment of error is as follows:
 {¶ 18} "BOTH THE FRISK OF MR. GILLIS AND THE LOCATION OF THE PAT-DOWN SEARCH EXCEEDED THE SCOPE OF ANY PERMISSIBLE TERRY STOP"
 {¶ 19} "A police officer who has detained a suspect for investigation, or who has detained a subject in order to issue a citation, may perform a limited search of that person's outer garments for weapons if the officer possesses a reasonable and articulable suspicion that the person may pose a danger to the officer or others around them. (CitingTerry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20L.Ed.2d 889). The purpose of that search is strictly limited to weapons; it cannot be performed to locate contraband that the officer merely suspects might be there. * * * However, if in the course of a weapons search the officer's sense of touch detects objects that he immediately recognizes as contraband, he is authorized to retrieve them from the person's garments and seize them for use in a criminal prosecution." State v.Driscoll (Sept. 1997), Montgomery App. No. 16207. In other words, if "the identity of [the] object is immediately apparent from the way it feels, the officer may lawfully seize the object if he * * * has probable cause to believe that item is *Page 7 
contraband — that is, if the `incriminating character' of the object is `immediately apparent.`" State v. Darden (Nov. 24, 1999), Montgomery App. No. 17395.
 {¶ 20} We have held that "an officer's fear of violence when investigating drug activity is a legitimate concern that will justify a patdown search for weapons." In re: A.B.D., Montgomery App. No. 21517,2007-Ohio-1894. "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances.` (Internal citation omitted). The totality of the circumstances must `be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." State v. Mackey, 141 Ohio App.3d 604, 752 N.E.2d 350 ("this court has reviewed numerous cases wherein crack cocaine was located in a search that probed the area between a suspect's buttocks. The nagging question, which has yet to answered, is how weapons might reasonably be suspected to be there. Terry was concerned with a limited search of a suspect's outer garments, which the court said `must surely be an annoying, frightening, and perhaps humiliating experience.` Searches of these far more private areas of suspect's person can only be even more annoying, frightening, and humiliating. Some more explicit justification of them is warranted, in the context of Terry." Grady, J., concurring).
 {¶ 21} On direct examination, House testified that he put Gillis in handcuffs, "[d]ue to the fact that he was involved in what we believed to be drug activity and we had already recovered a knife from his person, at that point in time, until we could continue the patdown further to make sure that he wasn't additionally armed * * * ." House went on, "I completed the patdown and I checked the area between Mr. Gillis' buttocks, and as I did that I felt a hard object which was between the actual cheeks of his buttocks, which is a common *Page 8 
hiding place for narcotics. And when I felt this, I recognized it to be what I suspected it to be as crack cocaine.
 {¶ 22} "As I touched it with my hand, Mr. Gillis immediately clenched his buttocks together in an attempt to keep me from being able to feel the object. I immediately informed Mr. Gillis that he was under arrest for the crack cocaine which he had in his rear end."
 {¶ 23} The following exchange occurred between House and counsel for Gillis on cross examination as House described making contact with Gillis inside the store:
 {¶ 24} "Q. So, you're doing a patdown search at that time?
 {¶ 25} "A. Initially, yes.
 {¶ 26} "Q. You would characterize it as a Terry-type stop?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. Okay. And you're patting down the sides of him; is that correct?
 {¶ 29} "A. Initially, yes.
 {¶ 30} "Q. Okay. And was it you that discovered the weapon?
 {¶ 31} "A. No. It was Detective Emerson.
 {¶ 32} "Q. Again, when we talk about weapon, this was a three-inch blade, right?
 {¶ 33} "A. Yes.
 {¶ 34} "Q. Three-inch knife, like that big. (Indicating)
 {¶ 35} "A. It is a knife. It is a weapon, yes.
 {¶ 36} "Q. All right. So, that's discovered, right? At that point, I believe you testified you put him in handcuffs, right?
 {¶ 37} "A. That's correct. *Page 9 
 {¶ 38} "Q. And then you are going to resume your patdown search, right?
 {¶ 39} "A. That's correct.
 {¶ 40} "Q. He's not under arrest at this time, is he?
 {¶ 41} "A. No.
 {¶ 42} "Q. Okay. At this time, you — after you pat down his butt area, his butt, correct?
 {¶ 43} "A. That is correct.
 {¶ 44} "Q. How many years have you been a detective?
 {¶ 45} "A. A little over three and a half.
 {¶ 46} "Q. And how many patdowns have you done?
 {¶ 47} "A. I've done well over a couple thousand.
 {¶ 48} "Q. How many weapons have you found in someone's butt?
 {¶ 49} "A. I have not actually found a weapon in someone's buttocks, but I know it is very easily possible to conceal a weapon in someone's buttocks area.
 {¶ 50} "* * *
 {¶ 51} "Q. Okay. Before — before you feel his butt, you know there's crack on him?
 {¶ 52} "A. No, I don't know there's crack on him.
 {¶ 53} "Q. Do you believe there's crack on him?
 {¶ 54} "A. I suspect that he probably has narcotics.
 {¶ 55} "Q. Okay. Isn't it true that you're feeling for crack at that time — his butt, right?
 {¶ 56} "A. No sir, I have a responsibility to myself and the other detectives to ensure that I can honestly say that this individual is not armed. And that is an area that I have to *Page 10 
check to make sure of all certainty that I can say that."
 {¶ 57} "* * *
 {¶ 58} "Q. * * * now, you didn't remove his pants, did you?
 {¶ 59} "A. No, I did not.
 {¶ 60} "Q. Would you agree that you arrang — rearranged some or all part of his clothing?
 {¶ 61} "A. No, I never rearranged anything.
 {¶ 62} "Q. You never rearranged — obviously you're grabbing his butt, but you didn't rearrange anything?
 {¶ 63} "A. No, not, — I don't know by what you're using as the term of `rearranging.' There was no rearranging of his clothing. His clothing remained on him exactly the way he apparently put them on.
 {¶ 64} "Q. Right, but you're feeling his clothes and trying to manipulate that thing, whatever it is in his butt, right?
 {¶ 65} "A. After I had recognized it as crack cocaine, yes, I manipulated it from the area that it was up to the waistband, still without removing his pants or anything of that nature."
 {¶ 66} All the facts and circumstances herein warranted aTerry investigative stop and pat-down of Gillis. The discovery of one weapon and the confirmed drug activity warranted additional precaution and concern for officers' safety. Although weapons may not commonly be located in the buttocks area, some legitimate concern was established by the testimony adduced herein. Further, House had probable cause to believe the item he could plainly feel through Gillis' pants was contraband. In fact, its identity was immediately *Page 11 
apparent to him, and he was authorized to remove it. In the context ofTerry, there was explicit justification for House's retrieval of the crack cocaine. Since the search of Gillis given these unique facts did not exceed the scope of Terry, Gillis' second assignment of error is overruled. Judgment affirmed.
FAIN, J., concurs.